COUNSEL FOR APPELLANT: Mark Stephen Pitt, Stephen Chad Meredith, Matthew Kuhn, Office of The Governor.
COUNSEL FOR APPELLEE COMMONWEALTH OF KENTUCKY EX REL. ANDY BESHEAR, ATTORNEY GENERAL AND ANDY BESHEAR, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF KENTUCKY: Andy Beshear, Attorney General of Kentucky, John Michael Brown, La Tasha Arnae Buckner, Steven Travis Mayo, Samuel Robert Flynn, Marc Farris, Office of The Attorney General.
COUNSEL FOR APPELLEE KENTUCKY EDUCATION ASSOCIATION: Jeffrey Scott Walther, Lexington, Victoria Frances Dickson, Walther, Gay, & Mack, PLC.
COUNSEL FOR APPELLEE KENTUCKY STATE LODGE FRATERNAL ORDER OF POLICE: David Lindsay Leightty, Alison M. Messex, Louisville, Priddy, Cutler, Naake & Meade, PLLC.
COUNSEL FOR APPELLEE BOARD OF TRUSTEES OF THE TEACHERS' RETIREMENT SYSTEM OF THE STATE OF KENTUCKY: Robert B. Barnes, General Counsel, Kentucky Teachers' Retirement.
COUNSEL FOR APPELLEE BOARD OF TRUSTEES OF THE KENTUCKY RETIREMENT SYSTEMS: Mark C. Blackwell, Katherine I. Rupinen, Joseph Patrick Bowman, Kentucky Retirement Systems.
COUNSEL FOR AMICUS CURIAE, BERTRAM ROBERT STIVERS II, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE KENTUCKY SENATE: David E. Fleenor, R. Vaughn Murphy, Tyler Peavler, Office of The Senate President.
COUNSEL FOR AMICUS CURIAE, DAVID W. OSBORNE, IN HIS OFFICIAL CAPACITY AS SPEAKER PRO TEMPORE OF THE KENTUCKY HOUSE OF REPRESENTATIVES: David Eric Lycan, Office of The Speaker.
OPINION OF THE COURT BY JUSTICE VENTERS
*77 Appellant, Governor Matthew G. Bevin, appeals from an opinion and order of the Franklin Circuit Court granting summary judgment to the Kentucky Education Association, the Kentucky State Lodge Fraternal Order of Police, the Board of Trustees of the Teachers' Retirement System of the State of Kentucky, the Board of Trustees of the Kentucky Retirement Systems, and Kentucky Attorney General Andy Beshear, which together we refer to as "Appellees." Appellants are supported in this appeal by an Amicus Curiae brief filed by Senate President, Bertram Robert Stivers, II, and Speaker Pro Tempore of the Kentucky House of Representatives, David W. Osborne, together referred to herein as Amicus.
As Plaintiffs in the circuit court, Appellees filed suit challenging the validity of Senate Bill 151 (SB 151), based upon what they contend to be its flawed enactment. SB 151 was passed during the 2018 session of the Kentucky General Assembly and it ostensibly makes several modifications to the various state government employee pension plans, including the pension plans for teachers, state police, and county employees.
The circuit court held that in passing SB 151 the legislature violated § 46 of the Kentucky Constitution by failing to give the bill a reading on three different days in each legislative chamber (the "three-readings" requirement), and by failing to obtain 51 votes in the House of Representatives as required for a bill which appropriates money or creates a debt. Upon its conclusion that SB 151 was not passed in compliance with the Kentucky Constitution, the circuit court voided the bill without addressing the substantive issues of whether the legislation violated the inviolable contract status afforded to state pensions under KRS 161.714[1] and whether the legislation violated the prohibition against impairment of contracts contained *78 in § 19 of the Kentucky Constitution.[2]
On appeal, Appellants first assert that a judicial interpretation of the three-readings requirement of § 46 is a non-justiciable matter, related exclusively to the legislative branch of government under principles connected with separation of powers and the political question doctrine, and thus, the circuit court erred by adjudicating it. Consistent with that argument, Appellants further assert that this Court is without authority to declare the meaning of § 46.
For the reasons set forth below, we disagree. Upon review, we conclude that the passage of SB 151 did not comply with the three-readings requirement of § 46 and that the legislation is, therefore, constitutionally invalid and declared void. Based upon this disposition, we do not address the arguments challenging the substantive provisions of SB 151. Our disposition renders moot the question of whether SB 151 constitutes an appropriation or created a debt subjecting it to the 51-vote majority provision of § 46. To address issues that may or may not recur in subsequent legislation would be an advisory opinion. The "courts do not function to give advisory opinions, even on important public issues, unless there is an actual case in controversy." Newkirk v. Commonwealth , 505 S.W.3d 770, 774 (Ky. 2016) (quoting Philpot v. Patton , 837 S.W.2d 491, 493 (Ky. 1992) ). The substantive merits of any future legislation on the subject matter before us should proceed without being influenced by this Court's opinion on the present legislation.
I. FACTUAL AND PROCEDURAL BACKGROUND
In response to the inadequate funding of Kentucky's public employee pension systems and a rising concern about the ability of those systems to meet future obligations, the Kentucky General Assembly opened its 2018 session with ambitious plans to address the looming financial threat by reforming the public pension systems. As an initial step toward that goal, Senate Bill 1 (SB 1) was introduced in the Senate on February 20, 2018. With the title, "AN ACT relating to retirement," SB 1 would make several changes to the Kentucky Employees Retirement System, County Employees Retirement System, State Police Retirement System, and Kentucky Teachers' Retirement System. The title of the bill is important because Section 51 of the Kentucky Constitution requires:
No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be reenacted and published at length.
Vocal opponents of SB 1 complained that it reduced annual cost-of-living-adjustments for retired public employees, put newly-hired employees into a hybrid-cash balance plan rather than the defined-benefits plans enjoyed by current employees, and limited the extent to which unused sick-leave credit could be used to enhance the retirement benefits for current and future public employees. Resistance to SB
*79 1 led to protests at the Capitol and in other forums around Kentucky. Legislative action on the bill stalled. Senate leadership referred SB 1 back to committee for additional study. No further action was taken on the bill, but the concern for the solvency of the pension systems did not subside.
On the fifty-seventh day of the sixty-day legislative session, the House Committee on State Government met to address pension-reform alternatives. Consensus on a plan for reform was reached. With time waning for legislative action, the Committee was confronted with § 46 's requirement for the bill to be read at length on three different days. Section 46 states in pertinent part:
No bill shall be considered for final passage unless the same has been reported by a committee and printed for the use of the members. Every bill shall be read at length on three different days in each House , but the second and third readings may be dispensed with by a majority of all the members elected to the House in which the bill is pending.
(emphasis added).
To pass the newly agreed-upon reform, the Committee invoked the following previously-used legislative maneuver: a different bill which had already been given one or more readings in each chamber would be "amended" by inserting the newly agreed-upon pension-reform text, with the expectation that the previous readings of the bill would count toward the three-reading requirement. To this end, SB 151 was selected.[3]
SB 151 had originated in the Senate with the title, "AN ACT relating to the local provision of wastewater services." In its original form, SB 151 consisted of eleven pages of text concerning contracts for the acquisition of local wastewater facilities.
When SB 151 was called in the House, it was amended by a Committee Substitute containing the pension reform language. The Committee Substitute removed every word of the bill pertaining to wastewater facilities and replaced those words with 291 pages of text addressing pension reform, much of which had been part of SB 1 but modified to remove the language that drew the most aggressive opposition.
When the Committee Substitute was introduced, SB 151 had already received three readings on different days in the Senate and two readings in the House. All the readings of the bill, however, in both substance and title, were in its form as a bill pertaining to local wastewater services. The principal issue before us is whether any of the prior readings of SB 151 in its original form can be counted toward satisfaction of the three-readings requirement of the bill after its transformation from a wastewater bill to a pension reform bill. Appellants and Amicus assert that the prior readings should count toward the three-reading requirement, while Appellees contend that none count.
*80 Our review of SB 151 in its final 291-page version discloses that the great majority of its text mirrors the language previously seen in SB 1. SB 1 and SB 151 were identical in many substantive respects, but the most significant difference is that the more serious reforms of the substituted version of SB 151 applied only to future public employees. Current employees remained largely unaffected.
Although several legislators opposing the pension reform embodied in SB 151 raised questions about the procedure by which it was being considered, none specifically objected to the practice of stripping out the wastewater services provisions and replacing them with pension-reform language. Silence on that aspect of the controversy lends credence to Appellants' claim that this legislative maneuver has long been regarded as an acceptable practice in the General Assembly. Among the issues raised by the legislative opponents was concern that SB 151, as amended, lacked the actuarial analysis required by KRS 6.350 ; that it lacked a statutorily-required fiscal note; and that it lacked the local government impact study required by KRS 6.995. They also complained that public input was averted, and that insufficient time had been allowed for legislators to review the substitute prior to voting.
With newly-inserted language transforming the act from a wastewater bill to a pension reform bill, SB 151 was voted out of Committee and reported favorably to the House floor, where it was immediately called up for final passage. Bearing only the title "AN ACT relating to the local provision of wastewater services," SB 1 was read in the full House "by title only" and then voted on as a pension reform bill.
To summarize, SB 151 with its original wastewater services title and text was "read" twice in the House before the introduction of the Committee Substitute that removed and replaced all its text but left the title intact. Thereafter, the House again "read" SB 151 by its title as a wastewater services bill but with the substantive text of a pension reform bill. Appellants assert that this final reading of the bill by its title provided the third-reading required by § 46. The House voted to pass SB 151 by a vote of 49 to 46 with five members abstaining. After the voting was completed, the title of SB 151 was then amended to identify it as a measure relating to retirement and public pensions, thus, complying with the subject-title match requirement of Section 51 of the Kentucky Constitution.
During its course through the legislative process, SB 151 received three readings in the Senate as a bill, in substance and title, pertaining to local wastewater services. In the House, it received two readings as a bill, in substance and title, pertaining to local wastewater services, and then it received a final "reading" in the House, still designated by title as a bill pertaining to local wastewater service but with the its textual content relating exclusively to public pension reform. Consequently, SB 151 was never "read" in either chamber by its title as an act relating to retirement and public pensions.
After the final vote and in due course, the Speaker Pro Tempore of the House signed the bill[4] and referred it back to the Senate the same day, where, with no additional *81 reading by text or title in its newly-amended form, SB 151 passed by a vote of 22-15. SB 151 was then signed by Senate President Stivers and sent to the Governor for his signature, which occurred on April 10, 2018.
The Kentucky Attorney General and various associations representing public employees and retirees promptly brought an action in Franklin Circuit Court challenging the enactment and validity of SB 151. With no dispute about the material facts, the circuit court granted summary judgment to Appellees. As relevant to this appeal, the circuit court held that SB 151 was passed in violation of § 46. The circuit court also determined that the bill constituted an appropriation and/or the creation of a debt and was thus in violation of the 51-vote majority requirement of § 46. Because of the trial court's disposition of the case, it did not reach the merits of the inviolable contract issue. Appellants promptly appealed to the Court of Appeals. This Court accepted immediate transfer of the proceedings pursuant to CR 74.02.
II. STANDARD OF REVIEW
The trial court granted summary judgment to the Appellees upon their claims that the procedure by which SB 151 was enacted violated § 46. The standard of review on appeal when a trial court grants a motion for summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." Blackstone Mining Co. v. Travelers Ins. Co. , 351 S.W.3d 193, 198 (Ky. 2010) (quoting Scifres v. Kraft , 916 S.W.2d 779, 781 (Ky. App. 1996) ); CR 56.03. Because there are no factual issues in dispute and all issues before us concern issues of law, our review is de novo. Owen v. University of Kentucky , 486 S.W.3d 266, 269 (Ky. 2016).
III. LEGISLATIVE COMPLIANCE WITH SECTION 46 IS A JUSTICIABLE ISSUE
We first consider the threshold issue raised by Appellants and Amicus asserting that the judicial branch should abstain from adjudicating legislative compliance with § 46 's three-reading requirement because doing so would violate the well-established doctrine of the non-justiciability of political questions.
The "political question" doctrine is natural corollary to the more familiar concept of separation of powers. Baker v. Carr , 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The doctrine holds that the judicial branch "should not interfere in the exercise by another department of a discretion that is committed by a textually demonstrable provision of the Constitution to the other department," Fletcher v. Commonwealth , 163 S.W.3d 852, 860 (Ky. 2005) ; or seek to resolve an issue for which it lacks judicially discoverable and manageable standards, Vieth v. Jubelirer , 541 U.S. 267, 276, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004).
Appellants argue that the processes and procedures by which a bill becomes a law are exclusively assigned to the legislative branch and that the legislature has exclusive authority to determine what is required by § 46. They argue that judicial intrusion into that question would violate the stringent separation of powers doctrine embedded in Kentucky's constitution. Amicus further contends that, regardless of the justiciability of the three-readings requirement, the provision is not mandatory but is instead merely directory to the legislative branch.
We recognize the wisdom and viability of the political question doctrine, and we *82 acknowledge our obligation to refrain from interfering with the internal processes and internal rules by which the other branches perform their constitutional functions. However, in this instance we are not addressing whether the passage of SB 151 conformed to the internal rules and processes of the General Assembly. We are confronted, instead, with the question of what § 46 of the Kentucky Constitution means when it says that "[e]very bill shall be read at length on three different days in each House"; and whether the enactment of SB 151 comports with that constitutional provision.
We must reject the argument that this Court has no voice in that determination. The foundational principle described in Marbury v. Madison , 5 U.S. 137, 177-78, 1 Cranch 137, 2 L.Ed. 60 (1803), has been a cornerstone of the American republic for as long as the republic has endured: "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.... This is of the very essence of judicial duty."
Kentucky has not wavered in its allegiance to that principle. See Stephenson v. Woodward , 182 S.W.3d 162, 174 (Ky. 2005) ("[J]ust as this court will not infringe upon the independence of the legislature, we will not cast a blind eye to our own duty to interpret the Constitution and declare the law."). Section 46 is not a procedural rule or policy written and adopted by the legislature to perform its constitutional function; it is an explicit provision of the Kentucky Constitution.
A. The issue before this Court is not a political question.
In support of the argument that the three-readings requirement of § 46 is a non-justiciable political question, Appellants cite § 39 of the Kentucky Constitution, which provides: "Each House of the General Assembly may determine the rules of its proceedings." From this provision, Appellants reason that the three-reading requirement is a "procedural requirement" imposed by the Constitution, "leav[ing] it to the General Assembly to determine how this requirement must be met."
Appellants also cite Sibert v. Garrett , 197 Ky. 17, 246 S.W. 455, 457 (1922), for the frequently-repeated observation that "[p]erhaps no state forming a part of the national government of the United States has a Constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does our Constitution...." We note that Sibert also reminds us the separation of powers doctrine "does not destroy the power of the courts to pronounce an act unconstitutional when its enactment is either expressly or by necessary implication inhibited and subversive of the purposes and intention of the makers of the [Kentucky] constitution...." Id. at 457.
Sibert emphasizes that under Kentucky's strong separation of powers doctrine, the power to declare a legislative enactment unconstitutional when its enactment violates constitutional principles is solidly within the Court's constitutional authority. We reiterated this point in Rose v. Council for Better Education, Inc. :
To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.
790 S.W.2d 186, 209 (Ky. 1989).
The Court's power to determine the constitutional validity of a statute *83 "does not infringe upon the independence of the legislature." Stephenson , 182 S.W.3d at 174 ("[W]e will not cast a blind eye to our own duty to interpret the Constitution and declare the law."). Far from being an intrusion into the arena constitutionally assigned to the legislature, the Kentucky Constitution and the constitutions of the United States and virtually all states vest the ultimate authority for discerning the meaning of constitutional provisions in the judicial branch. Interpreting the Constitution is, after all, "the very essence of judicial duty." Marbury , 5 U.S. at 177.
The Court's power, indeed, its duty, to declare the meaning of constitutional provisions is a primary function of the judicial branch in the scheme of checks and balances that has protected freedom and liberty in this country and in this Commonwealth for more than two centuries. The power of judicial review is an integral and indispensable piece of the separation of powers doctrine. To desist from declaring the meaning of constitutional language would be an abdication of our constitutional duty. Philpot v. Haviland , 880 S.W.2d 550, 553 (Ky. 1994).
Quoting Baker v. Carr , we recognized in Philpot six standards for determining when the Courts should defer the resolution of an issue based upon the political question doctrine. Those standards are:
1. a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
2. a lack of judicially discoverable and manageable standard for resolving it; or
3. the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
4. the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or
5. an unusual need for unquestioning adherence to a political decision already made; or
6. the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
880 S.W.2d at 553.
Applying these standards to the present case, we first note that there is no "textually demonstrable constitutional commitment" assigning to the General Assembly the sole authority to define the meaning of § 46 's three-readings requirement. We acknowledge without reservation the General Assembly's explicit power under Section 39 to make its own rules for its own proceedings, but as noted above, we are not tasked with deciding the meaning of the legislature's own rules. We take no issue with those rules. Section 46 is not a rule of the General Assembly to be defined, interpreted, and applied exclusively by the General Assembly.
Second, under the circumstances presented here, we do not lack judicially discoverable and manageable standards for resolving the meaning of § 46. What constitutes or does not constitute a "reading" of a bill on different days is, under the most deferential of standards, something to be resolved under ordinary rules of constitutional interpretation.
Third, the determination of the three-reading requirement is not dependent upon an "initial policy determination of a kind clearly for nonjudicial discretion." We leave the policy implications to the General Assembly. Our determination of the meaning of § 46 does not involve policy. Furthermore, this Court can undertake an independent resolution of the three-readings issue with no lack of respect for the legislature.
*84 Our review of § 46 simply follows our normal rules of constitutional construction. As further explained below, we indeed agree with Appellants' assertion that a reading by title only conforms to the constitutional demand for the bill to be "read at length," and we respectfully agree that a bill need not be reread in its entirety following each amendment.
Concerning the fifth Baker factor, the question before us presents no "unusual need" to adhere to political decisions already made. Finally, there is no potential for "embarrassment from multifarious pronouncements by various departments on one question" that would weigh against a judicial interpretation of whether SB 151 was passed in compliance with § 46.
Appellants rely heavily upon Philpot , 880 S.W.2d 550, and we agree that Philpot presents an excellent example of the political question doctrine's application. Philpot examined the following provision of § 46 :
No bill shall be considered for final passage unless the same has been reported by a Committee and printed for the use of the members.... But whenever a committee refuses or fails to report a bill submitted to it in a reasonable time, the same may be called up by any member, and be considered in the same manner it would have been considered if it had been reported.
The Senate incorporated this provision in its own Senate Rule 48, which permitted any member to call up the bill he or she thought had been held too long in committee, but which also provided that the ascertainment of whether the bill had been held an unreasonable time was to be determined by a majority vote of the elected members. A group of senators challenged Senate Rule 48 as being in violation of § 46. Applying the political question doctrine, we held:
Had the Senate simply failed to adopt a rule implementing the Constitutional mandate whereby "any member" could set in motion a procedure guaranteed to address a committee's failure or refusal to report a bill, this Court could then take note of such default. However, once the Senate adopted a procedure such as Rule 48 provides, this Court has no authority to edit or rewrite it on the grounds that it could be improved upon.
....
We are of the opinion ... that the determination of what is a "reasonable time" in this context, is a matter for the legislature to determine, under Section 39 of the Kentucky Constitution. For us to presume to define a "reasonable time" would result in the judiciary usurping the power of the Senate to determine for itself through its own rules when a committee has failed to report a bill within a reasonable time.
....
[T]his Court is of the opinion that it is most appropriate for the Kentucky State Senate to determine what constitutes a "reasonable time" for a committee to retain proposed legislation. Such a determination is a political question, which traditionally courts have declined to address in the exercise of proper restraint, and have left to the appropriate branch of government. The Kentucky Senate has the "full knowledge and appreciation ascribed to the ... legislature of the political, social and economic conditions which have prevailed" since the legislation was introduced, and thus, the Senate is best able to determine when a committee has held a bill an unreasonable period of time.
Philpot , 880 S.W.2d at 552-54.
Appellants argue that Philpot is directly on point because, just as we found the definition of "reasonable time" to be a *85 political question, we must similarly agree that the determination of what "read at length on three different days in each House" is also a political question. We are persuaded that Philpot is distinguishable from the present case.
First, Philpot involved an action to have this Court preemptively define the meaning of a "reasonable time." There was no constitutional challenge to enacted legislation. Second, unlike the inherently variable and necessarily imprecise term, "reasonable time," which implicates "a lack of judicially discoverable and manageable standard for resolving it," Baker , 369 U.S. at 217, 82 S.Ct. 691, whether a bill has been "read at length on three different days" is a straight-forward matter clearly susceptible to judicial review.
Appellants also cite Gunn v. Hughes , 210 So.3d 969 (Miss. 2017). In Gunn , the Mississippi Supreme Court addressed a provision in the Mississippi Constitution which provides that "every bill shall be read in full immediately before the vote on its final passage upon the demand of any member." See Article 4, Section 59 of the Mississippi Constitution. Representative Hughes brought a lawsuit alleging that upon his request to have certain bills fully read aloud as required by that article, House Speaker Gunn had the bills electronically read aloud by a machine at such a fast pace as to be incomprehensible, and could not, therefore, qualify as an actual "reading" of the bill. The Mississippi Supreme Court rejected that argument, stating:
By requesting the courts to force Speaker Gunn to read bills in a particular manner, Rep. Hughes seeks to involve the judiciary in legislative procedural matters. The text of our state Constitution that imposes upon the Legislature the obligation to read bills upon a member's request, necessarily commits upon the Legislature the obligation to determine how that requirement will be carried out. So this case must be dismissed, not as a matter of judicial discretion, but because we are without constitutional authority to adjudicate it. The constitutional authority, and duty, to decide the matter lies squarely within the legislative branch of our government.
210 So.3d at 974.
We do not disagree with the Mississippi Court's resolution in Gunn; but Gunn is also readily distinguishable. However preposterous it was to physically read aloud a bill at an incomprehensible pace, it cannot be disputed that the bill was literally read aloud in its entirety. The Court declined to engage in the minutia of directing the legislature how fast or slow it must read the bill. In the case before us, nothing happened that can even plausibly comport with any conception of the phrase "read at length on three different days." Under any plausible meaning of those words that remains faithful to the English language, we can say with certainty that no part of SB 151 that eventually was sent to the Governor, including its title, was ever "read" in either chamber. The rationale of Gunn remains unpersuasive.
Appellees direct our attention to D & W Auto Supply v. Department of Revenue , 602 S.W.2d 420 (Ky. 1980). In D & W Auto Supply , we addressed the provision contained in § 46 which requires that an appropriation bill receive a majority vote of all members sitting, which in the House of Representatives is 51 votes. The anti-littering appropriation bill in D & W Auto Supply received only 48 votes.
To determine whether a constitutional violation had occurred under these circumstances, we revisited and overruled the *86 "enrolled bill doctrine"[5] that had been the controlling rule in Kentucky since 1896 pursuant to Lafferty v. Huffman , 99 Ky. 80, 35 S.W. 123 (1896). Under the enrolled bill doctrine, when attested by the presiding officers as the law required, an enrolled bill, "must be accepted by the courts as the very bill adopted by the legislature, and that its mode of enactment was in conformity to all constitutional requirements. When so authenticated, it imports absolute verily, and is unimpeached by the [legislative] journals." Id. at 126. The doctrine "conclusively presumes the validity of a bill passed by the legislature and signed by the legislative officers." D & W Auto Supply , 602 S.W.2d at 423. D & W Auto Supply overruled Lafferty and, citing § 26,[6] replaced it with this rule:
Section 26 of the Kentucky Constitution provides that any law contrary to the constitution is "void." The proper exercise of judicial authority requires us to recognize any law which is unconstitutional and to declare it void. Without belaboring the point, we believe that under section 228 of the Kentucky Constitution it is our obligation to "support ... the Constitution of this Commonwealth." We are sworn to see that violations of the constitution by any person, corporation, state agency or branch of government are brought to light and corrected. To countenance an artificial rule of law that silences our voices when confronted with violations of our constitution is not acceptable to this court.
We believe that a more reasonable rule is ... the "extrinsic evidence" rule.... Under this approach there is a prima facie presumption that an enrolled bill is valid, but such presumption may be overcome by clear, satisfactory and convincing evidence establishing that constitutional requirements have not been met.
D & W Auto Supply , 602 S.W.2d at 424-25 (citations omitted).
By abolishing the enrolled bill doctrine, D & W Auto Supply adopted the extrinsic evidence rule, rejecting the exclusion of the judiciary from examining whether an enactment was passed in violation of the constitution and fatally undercutting Appellants' assertion that the meaning of the three-readings requirement is not within judicial purview. Further undercutting Appellants' argument is the fact that D & W Auto Supply specifically held that a bill passed in violation of the majority-vote clause of § 46 was unconstitutional, and therefore, void.
Based upon the foregoing analysis, we reject Appellants' position that this Court must abstain from hearing Appellees' challenge to SB 151. We are satisfied that judicial review of the meaning of any provision of the Kentucky Constitution is well within the separate powers assigned the judicial branch and that the question before us is not a non-justiciable political question.
B. The three-readings clause of § 46 is a mandatory, rather than directory constitutional provision.
Amicus raises another important point implicating the justiciability of this matter. Although not raised or addressed *87 in the trial court, we find it worthy of consideration and essential to a clear interpretation of § 46. Amicus asserts that the bill "shall be read at length on three different days in each House" clause of § 46 is not a mandatory prerequisite for the valid enactment of a bill, but rather is a mere directive, an instructional guide to be interpreted or even waived at the discretion of the General Assembly. We find no preservation of the issue as required by CR 76. Nevertheless, because of the importance of the issue and its close connection to the issue of justiciability, we address it.
If the word "shall" as used in the three-reading clause of § 46 is mandatory, the issue of the clause is justiciable. If the word "shall" as used there is merely directory, the legislature's failure to comply may not affect the ultimate validity of the bill. As explained by our predecessor court in Skaggs v. Fyffe , 266 Ky. 337, 98 S.W.2d 884, 886 (1936), "[a] proceeding not following a mandatory provision of a statute is rendered illegal and void, while an omission to observe or failure to conform to a directory provision is not."
"In determining the nature of the statutory provision, the use of the word 'shall' with reference to some requirements ... is usually indicative that it is mandatory, but it will not be so regarded if the legislative intention appears otherwise." Id. Skaggs further explained that "directory" refers to the use of the word "shall" to give "directions which ought to be followed" to "accomplish a given end." Skaggs holds that "[I]f the directions given by the statute are violated, but the given end is in fact accomplished without affecting the real merits of the case, then the statute is to be regarded as directory merely." Id. (quoting Varney v. Justice , 86 Ky. 596, 6 S.W. 457, 459 (1888) ).
In support of the argument that § 46 's use of "shall" is merely directory, Amicus directs our attention to Hamlett v. McCreary , 153 Ky. 755, 156 S.W. 410 (1913). Hamlett addressed the "[n]o bill shall become law" language contained in the first clause of § 56 of the Kentucky Constitution :
No bill shall become a law until the same shall have been signed by the presiding officer of each of the two Houses in open session; and before such officer shall have affixed his signature to any bill, he shall suspend all other business, declare that such bill will now be read, and that he will sign the same to the end that it may become a law. The bill shall then be read at length and compared; and, if correctly enrolled, he shall, in the presence of the House in open session, and before any other business is entertained, affix his signature, which fact shall be noted in the journal, and the bill immediately sent to the other House. When it reaches the other House, the presiding officer thereof shall immediately suspend all other business, announce the reception of the bill, and the same proceeding shall thereupon be observed in every respect as in the House in which it was first signed. And thereupon the Clerk of the latter House shall immediately present the same to the Governor for his signature and approval.
Ky. Const. Sec. 56 (emphasis added).
In Hamlett , the General Assembly passed a bill relating to bond payment premiums, but the bill was not signed by the President of the Senate. The Governor declined to sign the bill, and he did not veto it; he simply ignored it. Hamlett later sought payment upon the terms contained in the bill. When payment was refused, he brought a mandamus action to compel payment in compliance with the bill.
The Hamlett Court, noting the prefatory "no bill shall become law" language of *88 § 56, held that " Section 56 of the Kentucky Constitution... is mandatory in its provisions and not merely declaratory, since it prohibits a bill from becoming a law until it shall have been signed by the presiding officer of each house." Hamlett , 156 S.W. at 412. In its analysis, the Court quoted from the Missouri case State v. Mead , 71 Mo. 266 (Mo. 1879), as follows:
We are convinced that the initial clause of the section that 'no bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session' is mandatory, though it is quite evident that the mandate of the Constitution would be obeyed, so far as concerns proper authentication of the bill, when it receives the signature of the respective presiding officers in open session. But we do not regard the other clauses of the section under review as mandatory; for it is to be observed that those clauses do not declare that 'no bill shall become a law ,' if the presiding officers or the members fail to perform the duties which the residue of the section imposes, but the only penalty directly expressed is that contained in the initial clause just noted.
Id. at 412-13 (emphasis added).
Amicus argues from the Mead rationale that because the three-readings requirement of § 46 is not prefaced with the phrase, "no bill shall become law until" or similar language, it too should be construed as directory rather than mandatory. Mead , an 1879 Missouri case, is not a controlling authority upon our review, but we appreciate its instructive value.
In its entirety, § 46 states:
No bill shall be considered for final passage unless the same has been reported by a committee and printed for the use of the members. Every bill shall be read at length on three different days in each House, but the second and third readings may be dispensed with by a majority of all the members elected to the House in which the bill is pending. But whenever a committee refuses or fails to report a bill submitted to it in a reasonable time, the same may be called up by any member, and be considered in the same manner it would have been considered if it had been reported. No bill shall become a law unless , on its final passage, it receives the votes of at least two-fifths of the members elected to each House, and a majority of the members voting, the vote to be taken by yeas and nays and entered in the journal: Provided, Any act or resolution for the appropriation of money or the creation of debt shall, on its final passage, receive the votes of a majority of all the members elected to each House.
Ky. Const. Sec. 46 (emphasis added).
In the context of statutory interpretation, Skaggs further explained:
Whether a statute is to be deemed directory or mandatory depends, not on form, but on the legislative intent, which is to be ascertained by interpretation from consideration of the entire act, its nature and object, and the consequence of construction one way or the other. If the provision relates to some immaterial matter, not reaching the substance, or not of the essence of the thing to be done, and by an omission to observe it the rights of those interested will not be prejudiced-as where compliance is a matter of convenience or the directions are given merely with a view to securing proper, orderly, or prompt procedure-it is generally regarded as but directory. Of course, the term "mandatory" embraces the converse character of provisions, which are conditions precedent.
98 S.W.2d at 886 (citations omitted).
More recently, in Vandertoll v. Commonwealth , we explained the meaning of "shall" as follows:
*89 KRS 446.080(4) states that "[a]ll words and phrases shall be construed according to the common and approved usage of language...." "In common or ordinary parlance, and in its ordinary signification, the term 'shall' is a word of command and ... must be given a compulsory meaning." "If the words of the statute are plain and unambiguous, the statute must be applied to those terms without resort to any construction or interpretation." Shall means shall.
110 S.W.3d 789, 795-96 (Ky. 2003).
While Amicus correctly observes that the three-readings clause of § 46 is not prefaced with the phrase, "no bill shall become law," we are unable to discern any indication that the framers of our Constitution intended to simply offer a mere helpful suggestion on how pending legislation might be presented in each chamber.[7] Regardless of what it means for a bill to be "read at length," there is no doubt from the language employed that the drafters predicated the validity of the legislation upon compliance with the mandate to read at length, "every bill." Moreover, we remain mindful of the special consideration that must be accorded to constitutional provisions:
In Arnett v. Sullivan , [279 Ky. 720, 132 S.W.2d 76 (Ky. 1939) ] an exhaustive review of the authorities was entered into as to the correct theory of constitutional construction, that is, as to whether or not constitutional provisions are mandatory or directory, and it was there said: "with few exceptions, and only where the provision under consideration was of such a nature as to scarcely present the question, the rule is declared that constitutional provisions are mandatory and never directory. "
Harrod v. Hatcher , 281 Ky. 712, 137 S.W.2d 405, 406 (1940) (emphasis added). For the foregoing reasons, we are compelled to regard the three-readings requirement of § 46 as mandatory, rather than directory as urged by Amicus.
In summary, we conclude that the question of what § 46 requires, and whether the enactment of SB 151 conformed with those requirements, is a justiciable cause.
IV. THE ENACTMENT OF SB 151 FAILS TO COMPLY WITH THE THREE-READINGS REQUIREMENT OF § 46 OF THE KENTUCKY CONSTITUTION.
Having crossed the threshold issue of justiciability, we proceed to examine the meaning of the three-readings provision of § 46 and whether SB 151 was passed in compliance with that Constitutional provision.
As with the words we find in contracts and statutes, "words used in the Constitution must be given their plain and ordinary meaning." City of Louisville Municipal Housing Commission v. Public Housing Administration , 261 S.W.2d 286, 287 (Ky. 1953) ; Court of Justice ex rel. Administrative Office of the Courts v. Oney , 34 S.W.3d 814, 816 (Ky. App. 2000). Of similar import, "where the language of the Constitution leaves no doubt of the intended meaning of the section under consideration, courts may not employ rules of construction." Grantz v. Grauman , 302 S.W.2d 364, 366 (Ky. 1957) (citations omitted). "[I]n construing one section of a Constitution a court should not isolate it from other sections, but all the sections bearing on any particular subject should be brought into consideration and be so interpreted as to effectuate the whole purpose of the Constitution." Id.
*90 One of the cardinal rules for the interpretation of statutes is that the courts should avoid adopting a construction which would be unreasonable and absurd in preference to one that is "reasonable, rational, sensible and intelligent." Johnson v. Frankfort & C. R. R. , 303 Ky. 256, 197 S.W.2d 432, 434 (1946). The same rule also applies in our efforts to construe the meaning of constitutional provisions.
We apply these long-established principles in our review of § 46. At first glance, the phrase, "Every bill shall be read at length on three different days in each House" seems simple and clear. In its plain ordinary sense, "to read" simply means to look at and comprehend or to speak aloud written words. At first glance, one might reasonably surmise that to be "read at length" in each House of the General Assembly, the words of each bill must be collectively looked at and spoken aloud in its entirety.
We agree with Appellants and Amicus that such a literal interpretation of the words produces an unreasonable and absurd result. To recognize the absurdity of reading aloud every word of every bill in each house, one need only imagine reading the 291-page bill now under review and extending that consumption of legislative time and attention to every bill considered by the General Assembly in each session and doing so three times on different days. The framers of our Constitution were not intent upon burdening the legislature with such an absurd waste of time.
We do not purport to state within the pages of this opinion all the ways by which a bill may be "read" in compliance with § 46, nor do we conclude that there is only one way that a bill can be "read" in compliance with § 46. We are satisfied that the common legislative practice of reading only the title of the bill and electronically publishing simultaneously the full text of the bill to the electronic legislative journal available on every legislator's desk satisfies the constitutional mandate of § 46. See Richards Furniture Corp. v. Board of County Comm'rs of Anne Arundel County , 233 Md. 249, 196 A.2d 621, 627 (1964) ("[A] reading of a bill by a reading of its title only is a sufficient 'reading' thereof to satisfy the constitutional provision relating to three readings."); cf. McClellan v. Stein , 229 Mich. 203, 201 N.W. 209, 211 (1924) ("While the method of first and second reading by title has been criticized as not in strict conformance with the constitutional provision upon the subject, in view of the customary legislative rule and practice of supplying each member with a printed copy at least five days before passage of any bill, this court has declined to hold invalid laws so passed where the journal showed the third reading was in full.").
Nevertheless, while we agree that the mode chosen by the General Assembly to "read" a bill passes constitutional muster, we are constrained to the conclusion that SB 151, as finally enacted, never received such readings in either legislative chamber.
The words "SB 151" were, indeed, "read" three times but the title read along with that designation each time was "AN ACT relating to the local provision of wastewater services." Although read only by title, the title by which SB 151 was read never had any connection with the subject matter of the measure enacted: "AN ACT relating to retirement," nor did it connote any information to signify that the act related to public pensions or the retirement benefits of public employees. Nothing in the utterance of the bill's numerical designation, SB 151, conveyed any information that the reading was related to a pension reform bill. The title as read in *91 each chamber pertained to the local wastewater services measure that was discarded.
In deference to the General Assembly, we necessarily stop short of providing a complete and precise definition of what must occur to qualify as a reading of the bill, but we are well-settled in the conviction that what occurred here falls far short of the requirements of § 46.
As noted above, § 51 of the Kentucky Constitution requires that every law enacted by the General Assembly shall relate to only one subject and that subject "shall be expressed in the title." A fundamental premise underlying our holding that reading a bill "by title only" is an appropriate mode of compliance with § 46 's mandate to read a bill "at length" is the assumption that the title so read is germane to the law being enacted.
As we have noted, requiring every bill to be read aloud in its entirety in each legislative chamber would be an absurd construction of § 46 ; reading the bill by title only is sufficient. But, it is equally absurd to suggest that § 46 is satisfied by reading the title of a bill that has absolutely nothing to do with the subject matter of the bill.
Appellants maintain that the artifice used to enact SB 151 has been employed in the past on numerous occasions to enact numerous bills, and so a ruling affirming the trial court threatens the validity of many current laws. We are not persuaded. Any infirmities that might have been raised in timely fashion to challenge the enactment of now well-established laws are beyond the purview of this opinion. Moreover, we are not persuaded from the record here that such a potential parade of horrors awaits.
Appellants make much of the fact the Kentucky Education Reform Act (KERA) was passed using the same stratagem used to enact SB 151 as a pension reform measure. An examination of that argument discloses that KERA was indeed passed after last-minute amendments were substituted. But, the amendments made to the KERA bill did not gut the contents of the bill and replace it with legislation relating to an entirely different subject matter, while retaining the original title, thus misdescribing the tenor of the legislation embodied by the bill.
We emphasize now that this opinion does not challenge the legislative process used here. We have no quarrel with the use of a committee substitute to change the language of legislation as it navigates the legislative process. The procedure itself is a matter beyond our sphere of authority. Our opinion is directed to the question of whether the reading of a bill "by title only" can satisfy the constitutional requirement of § 46 when the title so read has absolutely nothing to do with the substance of the bill. We can accept the argument of practicality that the reading of a bill "by title only" would achieve the framers' purpose for § 46. But, essential to the validity of that argument is the premise that the title of the bill is germane to the subject of the bill so that the reading by title only triggers some recognition of the bill's contents.
Of course, legislators may amend the text of a bill between its readings without running afoul of § 46. Ordinarily, the revised text is some variation of the original text and remains consistent with the theme reflected in the title of the bill. The complete elimination of all the words of the prior readings and their total replacement with words bearing no relationship to the title of the bill is a far different matter with respect to § 46 compliance.
*92 Hoover v. Board of County Comm'rs, Franklin County , 19 Ohio St.3d 1, 482 N.E.2d 575, 579 (1985) ("[A]mendments which do not vitally alter the substance of a bill do not trigger a requirement for three considerations anew of such amended bill. But, when the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days....") (quotation marks and citations omitted); Magee v. Boyd , 175 So.3d 79, 114 (Ala. 2015) ("[I]t is clear that the substitute version of HB 84 was not read 'on three different days' in each house. However, we hold that an amended bill or a substitute bill, if germane to and not inconsistent with the general purpose of the original bill, does not have to be read three times on three different days to comply with § 63 [Alabama's the three readings requirement.] ); State v. Ryan , 92 Neb. 636, 139 N.W. 235, 238 (1912) (allowing amendments to be introduced after the legislative session ends so long as "the amendment is germane to the subject of the original bill and not an evident attempt to evade the Constitution"); State v. Hocker , 36 Fla. 358, 18 So. 767, 770 (1895) (explaining that three re-readings are unnecessary when the amendments in question are "made germane to [the bill's] general subject, either to the body of the bill or to its title").
We are fully satisfied that compliance with § 46 as we have herein construed it will not create the legislative impediment Appellants portend. As plainly stated within the section itself, the second and third readings may be dispensed with by a majority vote. A bill with majority support can be passed with only one reading. Our construction of § 46 does not portend legislative gridlock.
Our interpretation of § 46 is based in part upon our consideration of the Constitutional Debates of 1891 that preceded the adoption of the present Kentucky Constitution. We find ample support for the position that the purpose of § 46 is to ensure that every legislator has a fair opportunity to fully consider a bill before it is called for a vote. For example, Delegate Strauss, explaining the purpose of § 46, stated:
[T]he effort of the Committee [drafting § 46 ] was to prevent hasty and inconsiderate, and sometimes corrupt legislation. ...
Sometimes it has happened in the history of our State, as of other States, that very important measures, affecting the interest of the whole people, especially revenue matters, have been introduced, without referring them to any Committee, frequently at the end of a session, without printing, and pushed through, to the great loss and detriment of the State.... [The Legislature] ought to give each general measure that degree of consideration which would secure accuracy, and we put this in to secure that consideration.... [U]nder our old constitution the reading of a bill for three consecutive days was evaded. It was waived, by unanimous consent, and bills of every character were put through without any sort of consideration.... To correct that evil, this section was drawn[.][8]
This emphasis upon "consideration" of each bill connotes more than simply a legislator's awareness of what a bill was about, although that result would undoubtedly be achieved by satisfying the first purpose.
This is further evidenced by the fact that § 46 requires not only that the bill be printed, "so that every member shall have an opportunity at least of knowing what he has voted on,"[9] but also that it be read. In *93 discussing the reading requirement, Delegate Clay explained that, because the "Orders of the Day" must be completely gone through after each reading of a bill, and because that process would take at least a week, "a bill [that] is not opposed at all, [would take] twenty or more days to pass [and] ... the [legislative] session shall not extend beyond sixty days."[10]
In response to this concern, the framers adopted an amendment that allowed the second and third reading to be dispensed with by a majority of all members.[11] This is important because it shows that the framers intended for the process to allow enough time for all legislators to consider a bill to their satisfaction before it is called for a vote, even after the bill has been printed so that each member could see what they were voting on. Had the framers been solely concerned with members simply knowing what it was they were voting on, as the Appellants argue, there would have been no need to require three readings.
In addition, an excerpt from Delegate Beckham provides perhaps the clearest evidence that the purpose of the reading requirement was to give members a fair opportunity to consider each bill, and not simply to ensure each member knew what they were voting on. Beckham stated the following:
It seems to me that the fact of the printing having been done, every member having fair opportunity to fully consider the bill, with it in his own hands, dispenses with the necessity of reading it on three different days; but, I think, it ought to be read once, and then the body considering it, if it sees proper, can dispense with the second and third readings.[12]
Here, Beckham states the purpose of the three-readings requirement-to give every member fair opportunity to fully consider the bill-but believes it is satisfied with the printing requirement. Nonetheless, Beckham agrees that the readings are still important, and a version of the bill requiring both printing and three readings, with the second and third capable of being dispensed with, is ultimately adopted.[13]
In sum, we are convinced that the purpose of § 46 was not simply to ensure that legislators knew what they were voting on. Rather, the purpose was to ensure that every legislator had a fair opportunity to fully consider each piece of legislation that would be brought to a vote. That purpose cannot be achieved by reading a bill only by its title which has no rational relationship to the subject of the law being enacted. The "reading" of SB 151 failed to comply even with this minimal requirement of § 46 of the Kentucky Constitution. Consequently, *94 we declare the enactment of SB 151 was contradictory to the Kentucky Constitution and is hereby declared void and of no effect.
V. DISQUALIFICATION OF ATTORNEY GENERAL
Appellants contend that the trial court erred by failing to disqualify the Attorney General from these proceedings on the grounds that his participation as an attorney in the case violated this Court's Rules of Professional Conduct for attorneys. The argument is based upon the premise that the Attorney General provided legal advice to the General Assembly specifically related to SB 1 and ultimately to the passage of SB 151, and thus, has a conflict of interest precluding him from suing the entity to whom he had rendered professional advice.
At issue are two communications issued by the Attorney General during the 2018 session concerning SB 1, released contemporaneously to the public, asserting that the proposed pension reforms violated the inviolable contract provisions applicable by statute to the state's public pension systems. These communications were plainly designated for public consumption and were not communications between a lawyer and a client. The communications in question expressing the Attorney General's "advice" on the constitutionality of the proposed pension legislation did not create an attorney-client relationship between the legislature and the Attorney General. We accordingly conclude that the trial court did not err by failing to disqualify the Attorney General from participating in the proceedings.
VI. OTHER ISSUES
Based upon our disposition above we need not address issues relating to whether the text of SB 151 violates the inviolable contract provisions attributable to the statutory provisions addressing state government pension plans and the impairment of contract provisions of Section 19 of the Kentucky Constitution ; and whether the text of SB 151 created an appropriation or debt so as to be subject to the 51 vote majority provisions of Section 46 ; and nor do we address whether the legislation is invalid for failing to meet the actuarial requirements contained in KRS 6.350 and the impact on local government requirements contained in KRS 6.995 and any other statutory provisions which may be implicated.
VII. CONCLUSION
For the foregoing reasons, the Opinion and Order of the Franklin Circuit Court is affirmed.
All sitting. All concur. VanMeter, J., also concurs by separate opinion in which Cunningham and Wright JJ., join.

"It is hereby declared that in consideration of the contributions by members and in further consideration of benefits received by the state from the member's employment, KRS 161.220 to 161.710 shall constitute, except as provided in KRS 6.696, an inviolable contract of the Commonwealth, and the benefits provided herein shall, except as provided in KRS 6.696, not be subject to reduction or impairment by alteration, amendment, or repeal." Other statutory provisions provide the same protection to the various other state government pension plans.

The trial court also granted motions to dismiss filed by named defendants, Bertram Robert Stivers, II, as President of the Kentucky Senate, and David W. Osborne, as Speaker Pro Tempore of the Kentucky House of Representatives based upon the doctrine of legislative immunity. President Stivers and Speaker Osborne have filed a joint Amicus Curiae brief supporting the positions of the Governor.

It is suggested that this procedure conflicts with House Rule 60, which provides in relevant part: "No amendment [of a bill] shall be in order that is not germane to the matter under consideration and unless it shall have been printed and previously distributed by the Clerk at least one legislative day prior to consideration of the bill or resolution." However, because pursuant to Section 39 "[e]ach House of the General Assembly may determine the rules of its proceedings," we necessarily abstain from considering whether Rule 60 was violated. The General Assembly itself is the final arbiter of its own rules. " 'Proper respect for a coordinate branch of the government' requires that we strike down an Act of Congress only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.' " National Federation of Independent Business v. Sebelius , 567 U.S. 519, 538, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012).

Section 56 requires that a bill be signed by the Speaker of the House. Because the Speaker position was vacant for most of the 2018 Legislative Session, the Speaker Pro Tempore fulfilled this function. While the Attorney General originally argued the enactment was invalid because it was not signed by the Speaker of the House, that issue has now been abandoned.

An enrolled bill means "The final copy of a bill or joint resolution which has passed both chambers in identical form." https://www.senate.gov/reference/glossary_term/enrolled_bill.htm (accessed December 2018).

"To guard against transgression of the high powers which we have delegated, We Declare that everything in this Bill of Rights is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or contrary to this Constitution, shall be void." Ky. Const. Sec. 26.

See the discussion of same in the following section of this opinion.

3 Kentucky Constitutional Debates 3858 (1891).

In discussing Section 46, Delegate Buckner stated the following: "[B]efore consideration by the House before which the bill comes, it shall be printed, so that every member shall have an opportunity at least of knowing what he has voted on. Then it shall be read." Id. at 3869.

Id. at 3866.

In response to Clay's concern, Delegate Carroll stated the following: "[T]he Committee have agreed to accept the amendment of the Delegate from Shelby to the first part of this section, and that dispenses with the necessity of reading the bill on three different days and obviates to a very great extent the objection urged by [Delegate Clay]." Id. The amendment in question inserted a provision that allowed the second and third reading to be dispensed with upon a vote of a majority of all members elected in the House in which the bill is pending. Id. at 3862 (amendment offered by Delegate from Shelby, J. C. Beckham).

Id. at 3866.

Id. at 3870.