Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us.  Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2021 CO 17**

**No. 20SC585, *Markwell v. Cooke*—Separation of Powers—Colo. Const. art. V, § 22—Reading Requirement—Justiciable Question—Nonjusticiable Political Question—Judiciary's Prerogative and Responsibility to Discern Compliance with Constitutional Provision—Legislature's Form or Manner of Compliance with Constitutional Provision is Beyond Judiciary's Domain.**

Article V, section 22 of the Colorado Constitution provides, in pertinent part, that "[e]very bill shall be read by title when introduced, and at length on two different days in each house." Colo. Const. art. V, § 22. This case asks the supreme court to decide whether uploading a bill to multiple computers and using automated software to simultaneously give voice to different portions of the bill at a speed of about 650 words per minute complies with the reading requirement in article V, section 22 of the Colorado Constitution. The supreme court holds that it does not. There are unquestionably different ways by which the legislature may comply with the reading requirement. But the cacophony generated by the computers here isn't one of them. And while the judiciary has no business

dictating the specifics of how the legislature might comply with the reading requirement, it is the judiciary's prerogative and responsibility to declare that the legislature did not comply with that requirement in this case.

The supreme court therefore agrees with the district court's determination that the unintelligible sounds produced by the computers on the Senate floor on March 11, 2019, did not fulfill the reading requirement. However, unlike the district court, the supreme court stops short of telling the legislature how to comply with the reading requirement. It was not within the district court's domain to dictate the form or manner by which the legislature may comply with the reading requirement. By prescribing how the legislature must comply with the reading requirement, the district court trespassed upon the separation-of-powers tenet so essential to our constitutional system of government. Accordingly, the supreme court affirms in part and reverses in part.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

## 2021 CO 17

---

### Supreme Court Case No. 20SC585

*C.A.R. 50 Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA1130
District Court, City and County of Denver, Case No. 19CV30973
Honorable David H. Goldberg, Judge

---

### Petitioners:

Cindi Markwell, Secretary of the Senate; and Leroy M. Garcia, Jr., President of the Senate,

v.

### Respondents:

John B. Cooke, Senator; Robert S. Gardner, Senator; and Chris Holbert, Senate Minority Leader.

---

### Judgment Affirmed in Part and Reversed in Part
*en banc*
March 15, 2021

---

**Attorneys for Petitioners:**
Recht Kornfeld, P.C.
Mark G. Grueskin
Marnie C. Adams
    *Denver, Colorado*

**Attorneys for Respondents:**
Jackson Kelly, PLLC
John S. Zakhem
*Denver, Colorado*

**Attorneys for Amicus Curiae Governor Jared Polis:**
Philip J. Weiser, Attorney General
Eric R. Olson, Solicitor General
Grant T. Sullivan, Assistant Solicitor General
Stephanie Lindquist Scoville, First Assistant Attorney General
*Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents, and **JUSTICE HOOD** and **JUSTICE HART** join in the dissent.
**JUSTICE HOOD** dissents, and **JUSTICE MÁRQUEZ** and **JUSTICE HART** join in the dissent.

¶1 Separation of powers among the legislative, executive, and judicial branches of government is the foundation on which our democracy rests and the fount from which our liberties flow. In urging ratification of the U.S. Constitution, James Madison referred to separation of powers as "the sacred maxim of free government." The Federalist No. 47, at 308 (James Madison) (Clinton Rossiter ed., 1961). Indeed, it is difficult to fathom a more central precept to the spirit and genius of America. Respect for this venerable principle requires us to afford a certain berth of deference to the decisions and judgments of our sister branches of government. That deference, however, is not unlimited. Where, as here, the interpretation of a provision in our state constitution is implicated, it is both our prerogative and responsibility to wade into the fray.

¶2 The constitutional axis on which this case revolves is the reading requirement in article V, section 22: "Every bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present." Colo. Const. art. V, § 22. The question before us is whether uploading a bill to multiple computers and using automated software to simultaneously give voice to different portions of the bill at a speed of about 650 words per minute complies with the reading requirement in article V, section 22. We think not.

¶3 There are unquestionably different ways by which the legislature may comply with the reading requirement. But the cacophony generated by the computers here isn't one of them. And while we have no business dictating the specifics of *how* the legislature might comply with the reading requirement, it *is* our prerogative and responsibility to declare that the legislature *did not* comply with that requirement in this case.

¶4 We therefore agree with the district court's determination that the unintelligible sounds produced by the computers did not fulfill the reading requirement. But we affirm in part and reverse in part because we conclude that it was not within the district court's domain to dictate the *form or manner* by which the legislature may comply with the reading requirement. "[I]n our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with common sense and the public weal." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) (internal quotation marks omitted). By prescribing *how* the legislature must comply with the reading requirement, the district court trespassed upon the separation-of-powers tenet so essential to our constitutional system of government.

**I. Facts and Procedural History**

¶5    In late February 2019, House Bill 19-1172 ("HB 1172")—a 2,023-page recodification of Title 12 of the Colorado Revised Statutes ("Professions and Occupations")—passed the Colorado House of Representatives. It was then introduced in the Colorado Senate and assigned to the Senate Committee on the Judiciary. On March 4, 2019, after receiving unanimous approval in that committee, the bill was referred for consideration by the full Senate.

¶6    The events that sparked this litigation occurred on March 11, 2019, when the bill was introduced in the Senate for its second reading. That morning, a member of the Senate asked for unanimous consent to waive the reading of the bill at length. Pursuant to article V, section 22 of the Colorado Constitution, Senator John B. Cooke requested that the bill be read at length.[1] Because there wasn't unanimous consent to dispense with an at-length reading of the bill, article V, section 22 required that the bill be read in full. Colo. Const. art. V, § 22. A pair of Senate staffers duly began reading the bill aloud, taking turns reading at a quick, but intelligible pace.[2] This continued until the staffers were instructed to stop, approximately three and a half hours after they began reading the bill.

---

[1] Senator Cooke was a prime sponsor of HB 1172 in the Senate.

[2] This is not an occurrence unique to Colorado. Less than two weeks ago, clerks in the U.S. Senate read aloud the entire 628-page COVID-19 relief bill. *See* Alan

¶7 The Senate Secretary, Cindi Markwell, then directed Senate staff to upload HB 1172 to multiple computers and to use automated software to recite different portions of the bill simultaneously at the maximum rate of about 650 words per minute. It is undisputed that four to six computers were then simultaneously used, each going over a different part of the bill, and that, together, they created a babel of sounds.[3]

¶8 Through their staff, Senators Cooke and Robert S. Gardner objected to this procedure and asked the Senate Secretary to slow down the computers.[4] The Senate Secretary declined to change course, however. Then, at 3:15 p.m., Senate Minority Leader Chris Holbert asked the Senate President, Leroy M. Garcia, Jr., to slow down the computers. But, like the Senate Secretary, the Senate President refused to do so. Thus, between four and six computers continued to churn out

Fram, *By Slimmest of Margins, Senate Takes Up $1.9T Relief Bill*, AP News (Mar. 4, 2021) [https://perma.cc/V6VE-895Y] (observing that one senator who was "at his desk for most of the night" appeared "to follow along silently, one sheet at a time").

[3] We have listened to a representative sample of the sounds produced by the computers and have confirmed that they were unintelligible. *See* Colorado Channel, *Colorado Senate 2019 Legislative Day 067*, http://www.youtube.com/watch?time_continue=12835&v=QCpq_3jlP30.

[4] Senator Gardner was also a prime sponsor of HB 1172 in the Senate.

unintelligible sounds for approximately four hours until the process completed shortly after 5 p.m.

¶9 The next morning, Senators Cooke, Gardner, and Holbert ("respondents") filed a verified complaint for injunctive relief and declaratory judgment against Senate President Garcia and Senate Secretary Markwell ("petitioners") in Denver District Court. Almost immediately, the court granted a temporary restraining order preventing petitioners from: (1) "refusing to read legislation"—including HB 1172—"in an intelligible fashion" without unanimous consent to dispense with the reading requirement, and (2) passing HB 1172 in violation of article V, section 22 "by failing to read the bill out loud on two consecutive days."

¶10 Respondents then filed a motion for a preliminary injunction. On March 19, 2019, the court held a hearing during which Senator Gardner testified about the unintelligible sounds produced by the computers. After listening to an audio recording of those sounds, the court agreed that they were indecipherable.

¶11 At the end of the hearing, the court granted a preliminary injunction. In a subsequent written order, the court examined whether the issue before it was justiciable, recognizing that it lacked authority to resolve nonjusticiable political questions. The court concluded that "judicial intervention at this juncture in the legislative process [was] appropriate and warranted" because "[w]hen a dispute arises that requires constitutional interpretation[,] it is incumbent upon the courts

to resolve the issue." Since respondents' requests for relief required the interpretation of the reading requirement in article V, section 22, the court "[did] not perceive" the case to involve a nonjusticiable political question.

¶12 Having determined that it could hear the case, the court turned to whether the process that unfolded on the Senate floor on March 11, 2019, constituted "read[ing]" for purposes of article V, section 22. The court held that it did not. It reasoned that "using multiple computers to read simultaneously different portions of a bill . . . at 650 words per minute [was] not within *legitimate* limits." The court noted that it could not "discern a single word" from the audio recording.

¶13 Next, the court applied the factors from *Rathke v. MacFarlane*, 648 P.2d 648, 653–54 (Colo. 1982), to ascertain whether a preliminary injunction was appropriate. As pertinent here, it found that: (1) respondents had a reasonable probability of success on the merits because "using multiple computers to read different portions of the bill at one time, at a speed the mind cannot comprehend, compromises and violates the legislative process"; (2) a preliminary injunction would prevent the real, immediate, and irreparable harm that would flow from a bill being passed in violation of the constitution; and (3) granting a preliminary injunction would protect the public interest by allowing HB 1172 to be read "in a comprehensible fashion." Weighing all the *Rathke* factors, the court ruled that respondents had met their burden on their request for a preliminary injunction.

¶14 The court thus entered a preliminary injunction, pursuant to C.R.C.P. 65(f), directing the Senate Secretary to comply with the reading requirement by "employ[ing] a methodology that is designed to read legislation in an intelligible and comprehensive manner, and at an understandable speed." The Senate later passed HB 1172, in compliance with this directive, and the Governor ultimately signed the bill into law on April 25, 2019.

¶15 On May 8, 2019, the court made the injunction permanent and granted respondents' request for a declaratory judgment. The court reiterated that: (1) "using five computers reading different portions of [HB 1172] at the same time at an incomprehensible speed" violated the reading requirement in article V, section 22, and (2) the Senate Secretary must read all future legislation "in an intelligible manner and at an understandable speed" upon a member's objection to a request to dispense with the reading requirement.

¶16 Petitioners appealed to the court of appeals. But the parties thereafter filed a joint C.A.R. 50 motion seeking direct review by our court. We granted the motion.[5]

---

[5] The issues we agreed to review are as follows:

1. Whether the District Court erred in finding that a dispute over the manner of the State Senate's "reading" of a pending bill, pursuant to Colo. Const.,

9

## II. Analysis

¶17   This case requires us to consider the interwoven issues of justiciability, constitutional interpretation, and injunctive and declaratory relief.  We first discuss the controlling standards of review.  We then consider, but ultimately reject, petitioners' contention that, under *Baker v. Carr*, 369 U.S. 186, 217 (1962), and its Colorado progeny, the question of whether the unintelligible computer sounds complied with the reading requirement is a nonjusticiable political question outside our purview.

¶18   After determining that this dispute is justiciable and properly before us, we draw guidance from established principles of constitutional interpretation and hold that the unintelligible sounds that emanated from the computers did not comply with the reading requirement.  But, unlike the district court, we stop short of telling the legislature *how* to comply with the reading requirement.

---

art. V, Sec. 22, was justiciable, rather than finding it was a political question and thus refuse to exercise jurisdiction.

2. Whether the District Court correctly evaluated the requirements for injunctive relief to direct the manner of the State Senate's "reading" of a pending bill.

3. Whether the District Court erred in granting declaratory relief, in light of non-textual parameters it established to direct bill readings in the State Senate for House Bill 19-1172 and future bills.

¶19 We wrap up our discussion by addressing the district court's permanent injunction and declaratory judgment. Because both forms of relief dictated the specific manner by which the legislature must comply with the reading requirement, we conclude that they went too far. Accordingly, we affirm in part and reverse in part.[6]

## A. Standards of Review

¶20 We begin our analysis on a rare patch of common ground. The parties agree, and we concur, that issues of constitutional interpretation are questions of law that are subject to de novo review. *Gessler v. Colo. Common Cause*, 2014 CO 44, ¶ 7, 327 P.3d 232, 235.

¶21 In contrast to the interpretation of a constitutional provision, "[t]he grant or denial of a preliminary injunction is a decision which lies within the sound discretion of the trial court." *Evans v. Romer*, 854 P.2d 1270, 1274 (Colo. 1993) (quoting *Rathke*, 648 P.2d at 653). Likewise, the decision whether to enter a

---

[6] We recognize that issuing injunctive relief prior to the enactment of a bill interferes with the legislative process and is unwarranted absent "extraordinary circumstances." *Lewis v. Denver City Waterworks Co.*, 34 P. 993, 995 (Colo. 1893). However, we did not grant certiorari review on whether the district court had authority, supported by extraordinary circumstances, to issue pre-enactment injunctive relief in this case. Therefore, we decline to address the question.

11

declaratory judgment is within the discretion of the trial court. *Saxe v. Bd. of Trs. of Metro. State Coll. of Denver*, 179 P.3d 67, 72 (Colo. App. 2007).

¶22    Generally, we show deference to a ruling within the trial court's discretion; only if such a ruling is manifestly unreasonable, arbitrary, or unfair will we overturn it. *Evans*, 854 P.2d at 1274. "If, however, the issue being reviewed concerns only legal, rather than factual[,] questions," we owe no deference to the trial court's ruling and our review is de novo. *State ex rel. Salazar v. Cash Now Store, Inc.*, 31 P.3d 161, 164 (Colo. 2001) (addressing a trial court's ruling on a motion for a preliminary injunction); *see also Zab, Inc. v. Berenergy Corp.*, 136 P.3d 252, 254 (Colo. 2006) ("Whether a trial court may exercise its discretion in granting declaratory relief under the [Colorado Uniform Declaratory Judgment Law] is a matter of statutory interpretation, which we review de novo.").

## B.  Determining Whether Legislative Action Comports with Constitutional Requirements Is Squarely Within the Judiciary's Wheelhouse

¶23    Before getting to the marrow of the matter, we must first address whether this case presents the kind of nonjusticiable political question "the resolution of which should be eschewed by the courts," *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1378 (Colo. 1985), in order to honor the doctrine of separation of powers, *Colo. Common Cause v. Bledsoe*, 810 P.2d 201, 205 (Colo. 1991) (citing Colo. Const. art. III).  Like the district court, we conclude that the issue of whether the

12

legislature complied with the reading requirement on March 11, 2019, requires

constitutional interpretation and is thus a prime candidate for judicial resolution.

Contrary to petitioners' arguments, this conclusion is supported by both United

States Supreme Court jurisprudence and Colorado case law.

¶24    In *Baker*, the United States Supreme Court identified the characteristics of a

nonjusticiable political question, explaining:

> Prominent on the surface of any case held to involve a political
> question is found a textually demonstrable constitutional
> commitment of the issue to a coordinate political department; or a
> lack of judicially discoverable and manageable standards for
> resolving it; or the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or the
> impossibility of a court's undertaking independent resolution
> without expressing lack of the respect due coordinate branches of
> government; or an unusual need for unquestioning adherence to a
> political decision already made; or the potentiality of embarrassment
> from multifarious pronouncements by various departments on one
> question.

369 U.S. at 217.   But the meaningful utility of these characteristics has been

questioned by well-respected legal scholars.  *See, e.g.*, Erwin Chemerinsky, *Federal

Jurisdiction* 153 (6th ed. 2007) (expressing the view that the *Baker* characteristics

"seem useless in identifying what constitutes a political question," and observing

that "most important constitutional provisions," including those that courts have

never hesitated to interpret, "are written in broad, open-textured language and

certainly do not include 'judicially discoverable and manageable standards'").

¶25    Helpful or not, the *Baker* characteristics cannot be mechanically applied here because Colorado district courts, unlike their federal counterparts, are courts of general jurisdiction. Colo. Const. art. VI, § 9; *Lobato v. State*, 218 P.3d 358, 369–70 (Colo. 2009). This critical difference between federal and state judicial authority is widely recognized and has been noted by none other than *Baker*'s authoring justice. *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501 (1977) ("[S]tate courts that rest their decisions wholly or even partly on state law need not apply federal principles of standing and justiciability that deny litigants access to the courts.").

¶26    Even so, we have consistently considered the characteristics outlined in *Baker* in our previous forays into the realm of justiciability.[7] And, importantly, mindful of those characteristics, we have found justiciable a constitutional question similar to the one we confront today. *See Bledsoe*, 810 P.2d at 206.

¶27    In *Bledsoe*, we were called upon to determine whether alleged violations of the "Give A Vote to Each Legislator" ("GAVEL") amendment to article V of the Colorado Constitution presented nonjusticiable political questions. *Id.* at 205. The

---

[7] *Lobato* is the exception. In *Lobato*, after evaluating "the critique of *Baker*" in the context of "affirmative state constitutional rights such as the education clause" at issue there, we found "that the *Baker* test d[id] not apply." 218 P.3d at 368–70.

14

GAVEL amendment "prohibit[ed] members of the General Assembly from committing themselves, or requiring other members to commit themselves, 'through a vote in a party caucus or any other similar procedure[] to vote in favor of or against any bill . . . or other measure or issue pending or proposed to be introduced in the general assembly.'" *Id.* at 203 (quoting Colo. Const. art. V, § 22a). The alleged violations of the GAVEL amendment in *Bledsoe* were related to voting commitments given by majority caucus members prior to the introduction of an appropriations bill into the General Assembly. *Id.* at 204.

¶28    Notably, like the reading requirement, the GAVEL amendment was aimed at ensuring the integrity of the enactment of bills. *Compare Proceedings of the Constitutional Convention of 1875* 725 (1907) ("To afford protection from hasty legislation, it is required that all bills . . . shall be *read* on . . . different days in each house before being passed") (emphasis added),[8] *and In re House Bill No. 250*, 57 P. 49, 50 (Colo. 1899) ("The object" of the printing requirement, which was adopted

---

[8] The framers of the state constitution and the people of the State of Colorado sought to afford protection from hasty legislation through four contemporaneous requirements: the reading requirement; the printing requirement, which provides that all bills must be printed; the requirement that only one subject be embraced by each bill; and the requirement that no bill be introduced (except for general government expenses) after the first twenty-five days of the legislative session. *See Proceedings of the Constitutional Convention of 1875* 725 (1907).

in conjunction with the reading requirement, "is to prevent, so far as possible, fraud and trickery and deceit and subterfuge in the enactment of bills, and to prevent hasty and ill-considered legislation."), *with* Legislative Council of the Colorado General Assembly, *An Analysis of 1988 Ballot Proposals* 21 (Aug. 16, 1988) [https://perma.cc/U2N3-G837] (under the GAVEL amendment, "[l]egislators will be given constitutional protection from being obligated to vote a certain way because of a party caucus position. The end result will be that the debate and vote on bills will reflect an exchange of ideas between differing ideologies rather than perfunctory floor debate"). Our analysis in *Bledsoe*, then, is of particular relevance.

¶29 Evaluating the concerns raised by the *Baker* Court, we concluded in *Bledsoe* that:

> Our interpreting these [constitutional] provisions in no way infringes on the powers and duties of the coequal departments of our government; moreover, we do not find present any of the political-question characteristics identified by the United States Supreme Court. On the contrary, the issue before us "is one traditionally within the role of the judiciary to resolve," for "it is peculiarly the province of the judiciary to interpret the constitution and say what the law is." We have decided numerous other cases that have raised issues of whether legislative actions violated statutory or constitutional provisions, and we have not held that the nature of such questions automatically renders them nonjusticiable political questions. We decline to find that the constitutional issues presented in this case constitute nonjusticiable political questions.

*Bledsoe*, 810 P.2d at 206 (internal citations omitted). So too here—the political-question characteristics set forth in *Baker* are glaringly absent, and our

interpretation of the constitutional provision under challenge in no way transgresses the bounds of another branch of government.

¶30 Unlike a policy decision or a value judgment, constitutional interpretation is not an issue "best left for resolution by the other branches of government, or 'to be fought out on the hustings and determined by the people at the polls.'" *Id.* at 205 (quoting *People ex rel. Tate v. Prevost*, 134 P. 129, 133 (Colo. 1913)). Rather, it is one that is "peculiarly [within] the province of the judiciary." *Id.* at 206 (quoting *Lamm*, 704 P.2d at 1378).

¶31 And so, though we deliberately write narrowly today out of respect for our coordinate branch of government charged with enacting laws, we decline to find that this case presents a question that's off limits to the judiciary. "It cannot be forgotten that . . . the judicial department has imposed upon it the solemn duty to interpret the laws in the last resort. However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it." *In re Legis. Reapportionment*, 374 P.2d 66, 68 (Colo. 1962).

### C. The Unintelligible Computer Sounds Did Not Comply with the Reading Requirement

¶32 Since we have concluded that this case is justiciable, we proceed to settle the parties' disagreement. Before getting ahead of ourselves, though, we pause to underscore the constricted scope of the question we resolve today: Did the unintelligible sounds generated by the computers on the Senate floor on March 11,

17

2019, satisfy the reading requirement in article V, section 22? Although we answer the question in the negative, we abstain from specifying the form or manner by which the legislature may comply with the reading requirement. Where, as here, a "constitutional requirement can be complied with in a number of ways," our task is limited: We simply "determine whether the method actually chosen is in conformity," *In re Interrogatories of Governor Regarding Certain Bills of Fifty-First Gen. Assembly*, 578 P.2d 200, 208 (Colo. 1978)—no more, no less. Thus, while it falls to us to discern whether the unintelligible computer sounds complied with the reading requirement, the possible forms or manners of compliance fall within "the sole province of the Legislature." *In re Interrogatories from House of Representatives Concerning Senate Bill No. 24, Thirty-Ninth Gen. Assembly*, 254 P.2d 853, 857 (Colo. 1953).

¶33    Whether the legislature adhered to the reading requirement here hinges on our interpretation of article V, section 22. In interpreting a constitutional provision, our obligation is twofold: to "prevent an evasion of [the constitution's] legitimate operation" and to effectuate "the intentions of the framers of our constitution and the people of the State of Colorado." *Bledsoe*, 810 P.2d at 206–07. The starting post for our construction is the "ordinary and popular meaning" of the plain language of the constitutional provision. *Gessler v. Smith*, 2018 CO 48, ¶ 18, 419 P.3d 964, 969 (quoting *Colo. Ethics Watch v. Senate Majority Fund, LLC*,

18

2012 CO 12, ¶ 20, 269 P.3d 1248, 1253–54).  In discerning the ordinary and popular meaning of an undefined word in a constitutional provision, we may consult definitions in recognized dictionaries.  *Wash. Cnty. Bd. of Equalization v. Petron Dev. Co.*, 109 P.3d 146, 152 (Colo. 2005).

¶34   Recall that the reading requirement provides in pertinent part: "Every bill shall be *read* by title when introduced, and at length on two different days in each house . . . ."  Colo. Const. art. V, § 22 (emphasis added).  The constitution does not define the word "read."  What, then, is its ordinary and popular meaning?

¶35   Predictably, the parties come to loggerheads over the answer to this question, each side advocating for the dictionary definitions most compatible with its respective position.  But we need not decide which definition reigns supreme. It suffices to declare that the unintelligible computer sounds did not conform with *any* of the proffered definitions or the definitions that we have independently consulted.

¶36   An 1866 edition of Webster's Dictionary (roughly contemporaneous with the 1876 adoption of the Colorado Constitution and the reading requirement) defined "read" to mean: "[t]o utter or pronounce written or printed words, letters or characters *in the proper order*; to repeat the names or *utter the sounds customarily annexed to words*, letters or characters."  *Read*, A Dictionary of the English Language 818 (10th ed. 1866) [https://perma.cc/BEZ8-CW9J] (emphases added).  We deem

19

it significant that under this definition, which petitioners fully embrace in their reply brief, the unintelligible sounds produced by the computers clearly did not constitute a "read[ing]" of HB 1172. The words of the bill were certainly not uttered or pronounced in their proper order. Nor were the sounds that customarily accompany those words ever uttered. Instead, the computers combined to create a noisy mishmash. The indiscernible sounds generated by the computers could not have been confused with the sounds that customarily accompany the words of HB 1172.

¶37 An 1890s Webster's Dictionary is equally unavailing for petitioners. That dictionary defined "read" to mean, among other things: (1) "[t]o interpret; to explain"; (2) "[t]o tell; to declare; to recite"; (3) "[t]o go over, as characters or words, and utter aloud, or to recite to one's self inaudibly; to take in the sense of, as of language, by interpreting the characters with which it is expressed; to peruse"; (4) "to know fully; to comprehend"; and (5) "[t]o discover or understand by characters, marks, features, etc.; to learn by observation." *Read*, Webster's International Dictionary 1194 (1890). The unintelligible computer sounds fit within none of these definitions. There was no way to interpret, explain, know fully, comprehend, learn, discover, or understand the text of HB 1172 by listening to the noise made by the computers. And that noise could not have been fairly characterized as telling, declaring, reciting, perusing, going over words and

20

reciting, or "tak[ing] in the sense of language." *Id.* What the computers produced was pure dissonance.

¶38 Current dictionaries define "read" along similar lines and reveal that the meaning of the word has not changed substantially since article V, section 22 was adopted in 1876. *See, e.g.*, *Read*, Merriam-Webster Online Dictionary [https://perma.cc/XCH4-TV3N] (defining "read" as "to utter aloud the printed or written words of"); *Read*, Collins Online Dictionary [https://perma.cc/VS44-TA5R] (defining "read" as to "say the words aloud"). Again, what came out of the computers were incomprehensible sounds, not words uttered or said aloud.

¶39 These and other definitions demand the same conclusion: Whatever the legitimate contours of the reading requirement, the unintelligible sounds from the computers do not fall within them. Put differently, while there are no doubt different ways to describe the noise made by the computers, "read[ing]" isn't one of them.

¶40 Significantly, today's decision aligns with the animating purpose behind the reading requirement. This is a strong bang to the gong that signals that petitioners' interpretation of the reading requirement is untenable. As we mentioned, the cardinal rule of constitutional interpretation calls on us to give life to the intent of the framers and the people of the State of Colorado. *Bledsoe*, 810 P.2d at 206. We underscore that the objective of the reading requirement is "[t]o afford protection

21

from hasty legislation," which, in turn, helps preserve the integrity of the bill-enactment process. *Proceedings of the Constitutional Convention of 1875* 725 (1907); *see also In re House Bill No. 250*, 57 P. at 50 (the goal of the printing requirement, which was enacted hand-in-hand with the reading requirement, is "to prevent, so far as possible, fraud and trickery and deceit and subterfuge in the enactment of bills, and to prevent hasty and ill-considered legislation").  Our review of the inscrutable computer sounds leads us to proclaim without hesitation that they can in no way be reasonably viewed as consistent with the reading requirement's objective.  To the contrary, accepting the jumbled computer sounds as "read[ing]" under article V, section 22 would directly undermine the purpose of the reading requirement.

¶41   The district court was of a like mind and held that the unintelligible computer sounds did not constitute "read[ing]" in accordance with article V, section 22.  And we affirm that part of its judgment.  But the court didn't stop there.  It went on to tell the legislature *how* it must comply with the reading requirement.  As we foreshadowed earlier and as we discuss in some detail next, this was error.

## D. The District Court's Permanent Injunction and Declaratory Judgment Impermissibly Prescribed How the Legislature Must Comply with the Reading Requirement

¶42 At the outset, we acknowledge that any question relating to the relief provided vis-à-vis HB 1172 has been rendered moot by the bill's subsequent passage and enactment into law. But our inquiry doesn't end there because the district court's final order applies to future legislation as well. We therefore must consider whether the court exceeded its authority in prescribing how the legislature must comport with the reading requirement in the future.

¶43 As relevant here, the separation of powers doctrine requires no less and permits no more than to have us interpret the constitution and determine *whether* the legislature complied with it. Consequently, while that doctrine confers upon us the prerogative and responsibility to decide that the legislature failed to comply with the reading requirement on March 11, 2019, it prohibits us from dictating to our coequal branch of government *how* to comply with the reading requirement moving forward. Under the Colorado Constitution, "the judiciary's authority to coerce legislators to comply with constitutional provisions governing the enactment of legislation is exceedingly limited." *Bledsoe*, 810 P.2d at 210. We have cautioned that in cases involving the legislature, "the judiciary's role in large part is limited to measuring legislative enactments against the standard of the constitution, and declaring them null and void if they are violative of the

23

constitution." *Id.* In line with that sentiment, the form or manner by which the General Assembly enacts legislation is part of its sole province. *In re Senate Bill No. 24*, 254 P.2d at 857.

¶44 In its final order, the district court made permanent the preliminary injunction it had issued earlier and then granted respondents' request for a declaratory judgment. In so doing, the court directed "the Secretary of the Senate, upon a proper objection," to comply with the reading requirement by "employ[ing] a methodology that is designed to read legislation in an intelligible and comprehensive manner, and at an understandable speed." It similarly instructed the Secretary of the Senate to "read legislation, including [HB 1172], in an intelligible manner and at an understandable speed."

¶45 This part of the district court's final order is problematic because it imposed parameters around the form or manner by which the legislature may conform to the reading requirement. It was not for the district court to spell out how to comply with the reading requirement. Doing so encroached on the legislature's turf. Hence, although we agree with the court's determination that the unintelligible sounds from the computers did not fulfill the reading requirement and thus violated article V, section 22, we disapprove of the court's order to the extent it circumscribed the form or manner by which the legislature may comply with that requirement. Accordingly, we affirm in part and reverse in part.

24

# III. Conclusion

¶46     The unintelligible sounds generated by the computers on the Senate floor on March 11, 2019, do not constitute "read[ing]" under article V, section 22. The district court reached the same conclusion, and we affirm that part of the judgment.[9]   But we reverse the judgment in part because the district court also impermissibly specified the form or manner by which the legislature must comply with the reading requirement.

**JUSTICE MÁRQUEZ** dissents, and **JUSTICE HOOD** and **JUSTICE HART** join in the dissent.
**JUSTICE HOOD** dissents, and **JUSTICE MÁRQUEZ** and **JUSTICE HART** join in the dissent.

---

[9] Neither side has expressed concern that our partial affirmance of the judgment may invite challenges to previously enacted legislation, and we decline to engage in such speculation. Regardless, it is our bounden duty to enforce the plain meaning of the language in article V, section 22, and we may not shirk that responsibility out of a desire to adhere to yesterday's practices or for fear of what tomorrow may bring.

**JUSTICE MÁRQUEZ**, dissenting.

¶47  I agree with the majority that it is our "solemn duty to interpret the laws." Maj. op. ¶ 31 (quoting *In re Legis. Reapportionment*, 374 P.2d 66, 68 (Colo. 1962)).  I further agree that "[w]hether the legislature adhered to the reading requirement here hinges on our interpretation of article V, section 22 [of the Colorado Constitution]." *Id.* at ¶ 33.  But I cannot join today's decision because the majority never actually interprets article V, section 22.  Instead, it simply declares that what the legislature did here violated that constitutional provision without explaining why.  Accordingly, I respectfully dissent.

¶48  The majority concludes that the computerized recitation of House Bill 1172 ("HB 1172") on March 11, 2019, was not really a "reading" of the bill—at least for purposes of article V, section 22.  But it does not explain why this is so, reasoning that its only task is to determine *whether* the reading requirement was met, "no more, no less." *Id.* at ¶ 32.  One is thus left to wonder what article V, section 22 in fact requires.  Must the words of a bill be "pronounced in their proper order?" *Id.* at ¶ 36.  Must listeners be able to "know fully, comprehend, learn, discover, or understand the text" of the bill being read? *Id.* at ¶ 37.  Must the reading be done in a manner consistent with what the majority identifies as the "animating purpose" of the reading requirement? *Id.* at ¶ 40.  The majority hints at all these possibilities but does not clearly say which, if any, are constitutional requirements.

1

¶49    In my view, the plain language of article V, section 22 simply requires that bills be "read," or uttered aloud. Nothing more. The provision does not, for example, demand that the bill be read "by a human voice" or "slowly enough to be intelligible," or that the sections of the bill be read "in sequence" or even at a particular decibel level. Not only is this interpretation consistent with the plain language of the provision, but it also conforms with the history and purpose of the reading requirement and accords proper deference to actual legislative practice. Here, because the entirety of HB 1172 was, in fact, read aloud, article V, section 22 was satisfied.

¶50    In sum, today's decision is neither demanded by the constitution nor appropriate under separation of powers principles or this court's traditional deference to the legislature's interpretations of provisions that govern their internal processes. Moreover, I fear that, in addition to offering no guidance on what article V, section 22 requires, the majority's ruling today also calls into question the constitutional validity of previous legislation enacted following readings similar to HB 1172.[1]

---

[1] I join Justice Hood's dissent in full but write separately to emphasize this court's role in interpreting the constitution as well as the plain text, history, and consistent legislative practice with regard to article V, section 22.

## I. This Court's Role in Reviewing Constitutional Challenges

¶51    I am concerned about the unduly limited role that the majority assigns this court in reviewing the constitutionality of legislative action.  We have long understood that it is the "duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  But the majority suggests that it exceeds our authority to explain what the constitution demands or "how to comply with the reading requirement moving forward."  Maj. op. ¶ 43.  Instead, the majority concludes that this court is "permit[ted] no more than to . . . determine *whether*" the constitution was violated.  *Id.*  Thus, while the majority correctly concludes that we are not precluded from reviewing this case under the political question doctrine, *see id.* at ¶ 31, it strips that review of much of its significance by "abstain[ing] from specifying" what the constitution demands, *id.* at ¶ 32.

¶52    To be sure, this court must declare *whether* the constitution has been violated in a given case.  But we also have a duty "to interpret the constitution and *say what the law is*."  *Colo. Common Cause v. Bledsoe*, 810 P.2d 201, 206 (Colo. 1991) (quoting *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1378 (Colo. 1985)) (emphasis added).  Indeed, interpretation of the law is "a function at the very core of the judicial role."  *Lamm*, 704 P.2d at 1379.  By articulating what the law means and what it requires, we not only justify our determination as to whether the law has been violated in the present case, but also indicate how similar cases should be decided in the

3

future.  *See generally* Karl Llewellyn, *The Common Law Tradition: Deciding Appeals* (1960).

¶53      The majority cites to *In re Interrogatories of Governor Regarding Certain Bills of Fifty-First General Assembly*, 578 P.2d 200, 208 (Colo. 1978), for the notion that this court's role is limited to stating whether legislation was constitutionally enacted, "no more, no less."  Maj. op. ¶ 32.  But in that case, we made that determination by comparing the legislature's actions to articulable standards imposed by the constitution:

> [W]hen the constitutional requirement can be complied with in a number of ways, our task is to determine whether the method actually chosen is in conformity.  *The critical inquiry is* whether, during final passage, the members of the legislative body were afforded the opportunity to approve or disapprove the pending bill and whether this individual approval or disapproval was recorded in the official journal as mandated by [article V, sections 22–23 of] the constitution.

*Fifty-First Gen. Assembly*, 578 P.2d at 208 (emphasis added).  Here, the majority skips a step by "simply 'determin[ing] whether the method actually chosen is in conformity'" without articulating the constitutional standards on which that determination is based.  *See* maj. op. ¶ 32 (quoting *Fifty-First Gen. Assembly*, 578 P.2d at 208).[2]

---

[2] If the majority's approach is meant to rectify the district court's improper entry of a permanent injunctive order, it is an overcorrection.  The General Assembly cannot be "restrained from passing an act, even though the constitution expressly

4

¶54 Because the majority has declined to interpret the relevant language of article V, section 22, I now turn to that task.

## II. Principles of Constitutional Interpretation

¶55 When interpreting the constitution, we begin our analysis with the plain language of the provision at issue, giving terms their ordinary and popular meaning. *In re Interrogatory on House Joint Resolution 20-1006*, 2020 CO 23, ¶ 30, __ P.3d __. If the language "is plain, its meaning clear, and no absurdity involved, constitutional provisions must be declared and enforced as written." *Id.* at ¶ 31 (quoting *In re Great Outdoors Colo. Tr. Fund*, 913 P.2d 533, 538 (Colo. 1996)).

¶56 However, if there is ambiguity regarding "the proper interpretation of a constitutional provision relating to the course of procedure, it should be solved in favor of the practical construction given it by the Legislature." *Bd. of Comm'rs of Pueblo Cnty. v. Strait*, 85 P. 178, 180 (Colo. 1906) (quoting *Browning v. Powers*, 38 S.W. 943, 945 (Mo. 1897)); *Great Outdoors Colo. Tr. Fund*, 913 P.2d at 538 ("Where

---

forbids it." *Bledsoe*, 810 P.2d at 208 (quoting *Lewis v. Denver City Waterworks Co.*, 34 P. 993, 994 (Colo. 1893)). But *declaring* a legislative practice lawful or unlawful and explaining why is different than *enjoining* the legislature. *Id.* at 211 ("In contrast to actions seeking injunctive relief against legislators, declaratory-judgment actions do not present the same kind or degree of affirmative interference with legislative activities . . . . Declaratory relief, if granted, does not 'compel[] [the legislature] to pass an act . . . nor restrain[] [it] from passing an act." (quoting *Lewis*, 34 P. at 994) (alterations in original)).

5

possible, courts should adopt a construction of a constitutional provision in keeping with that given by coordinate branches of government."). Indeed, for well over a century, we have made clear that "we should show great deference to the legislative construction of the Constitution, particularly with reference to its construction of the procedure provided by the Constitution for the passage of bills." *Fifty-First Gen. Assembly*, 578 P.2d at 208 (quoting *Strait*, 85 P. at 179). Even if we have "serious doubts as to the correctness of the legislative practice, . . . it is our duty to resolve the doubt in favor of the validity of the act" unless the clear text of the constitution demands otherwise. *Id.* (quoting *Strait*, 85 P. at 180).

### III. The Plain Language of Article V, Section 22

¶57 Article V, section 22 of our state constitution requires that "[e]very bill shall be read by title when introduced, and at length on two different days in each house; provided, however, any reading at length may be dispensed with upon unanimous consent of the members present." Nothing in the plain language of this provision requires the legislature to read bills in a particular way; the bills simply must be "read."

¶58 The word "read" is a term of "extensive and various application." Charles Richardson, *New Dictionary of the English Language* 1567 (1846). The 1866 Edition of Webster's Dictionary, cited by the majority, alone contains more than a dozen definitions of the term. *See Read*, *A Dictionary of the English Language* 818 (10th ed.

1866) [https://perma.cc/BEZ8-CW9J]. Some of these definitions are relevant while some—"to suppose; to guess," for example—are not. *See id.*

¶59     Most dictionaries contemporaneous to the 1876 ratification of our state constitution define the term "read" to mean, at least in part, something along the lines of "to speak it aloud." *See* Richardson, *supra*, at 1567; John Craig, *Universal English Dictionary, Comprising the Etymology, Definition, and Pronunciation of All Known Words in the Language, as Well as Technical Terms Used in Art, Science, Literature, Commerce, and Law* 518 (1869) (defining "read" as "to give utterance to the sounds which written or printed words or characters represent"); John Bouvier & Daniel Gleason, *Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union: With References to the Civil and Other Systems of Foreign Law* 412 (14th ed. 1878) (defining "reading" as "the act of pronouncing aloud . . . the contents of a writing or of a printed document"). Given the uniformity of these definitions, "[i]t cannot be maintained that the verb 'to read,' in all its moods and tenses, when applied to bills for acts pending before legislative bodies, has acquired a purely technical signification which absolutely excludes its ordinary meaning." *Weill v. Kenfield*, 54 Cal. 111, 113 (1880) (emphasis omitted). Put simply, the term "read" as it is used in article V, section 22 means nothing more than the ordinary act of uttering words aloud.

7

¶60    The 1866 Webster's Dictionary cited by the majority is the only roughly contemporaneous dictionary I found that adds the proviso "in the proper order." And, as the majority notes, that language was later dropped from the 1890 edition of the same dictionary. *See* maj. op. ¶ 37 (citing Webster's International Dictionary 1194 (1890)). Modern dictionaries similarly decline to adopt a definition of "read" that depends on pronouncing words in a particular sequence. *See, e.g., Read,* Merriam-Webster Online Dictionary, [https://perma.cc/C83K-LB8E] (defining "read" as "to utter aloud the printed or written words of").[3]

¶61    Accordingly, I conclude that the plain language of article V, section 22 is unambiguous and requires only that every word of the bill at issue be uttered aloud. Because every word of HB 1172 was, in fact, recited aloud, the reading requirement in article V, section 22 was met.[4] But even if the provision were

---

[3] Common sense also indicates that "read" need not always mean "read in the proper order." A teacher who reads a book of short stories aloud to a class but reads the individual stories out of sequence has still "read" that book in the ordinary sense of the term.

[4] To the extent the majority's holding rests on its assertion that the computers reciting the bill did not produce the "sounds that customarily accompany the words of HB 1172," I disagree. *See* maj. op. ¶ 36. Although the words were recited quickly and in an overlapping manner, making individual words difficult to differentiate, the "sounds that customarily accompany" each word clearly were voiced. *See, e.g.,* Colorado Channel, *Colorado Senate 2019 Legislative Day 067* 03:31:31–03:31:36, https://youtu.be/QCpq_3jlP30?t=12677 (in which the

ambiguous, I agree with Justice Hood that deference to the legislature demands that we respect the General Assembly's construction of the reading requirement. *See* Hood, J., diss. op. ¶¶ 86–87. The purported purpose that the majority ascribes to article V, section 22 does not justify reading language into the provision and contravening longstanding legislative practice.

## IV. The History and Purpose of Article V, Section 22

¶62 The majority concludes that the computerized reading of HB 1172 did not serve what it sees as the "animating purpose" of article V, section 22: preventing hasty and ill-considered legislation. *See* maj. op. ¶ 40. But this analysis of the reading requirement's purpose fails to consider the long history of that provision and its now-vestigial function of informing legislators of a bill's contents when those legislators could not read the bill in question.

¶63 The requirement that a bill receive multiple readings before enactment dates back to at least the 16th century in England. *See Legislation and Petitions*, The History of Parliament, https://www.historyofparliamentonline.org/volume/1604-1629/survey/xi-legislation-and-petitions [https://perma.cc/M3HW-VBX4]. The reading requirement was instituted because, "before the age of print,

---

computer closest to the recording microphone clearly recites "fourteen, fifteen, sixteen, seventeen, eighteen, nineteen").

9

and given the impracticality of producing multiple handwritten copies, the only means of informing Members of a bill's contents had been for the clerk to read the text aloud." *Id.*; *see also* Jeremy Bentham, *Essay on Political Tactics* (1791), *reprinted in The Works of Jeremy Bentham Part VIII* 299, 353 (John Bowring ed., 1839) ("Before the invention of printing, and when the art of reading was unknown to three-fourths of the deputies of the nation, to supply this deficiency, it was directed that every bill should be read three times in the House.").

¶64    Many states enshrined this parliamentary procedure in constitutional provisions requiring that bills be read multiple times in the legislature prior to enactment. *See, e.g.*, Ala. Const., § 63; Mich. Const. art. 4, § 26; N.J. Const. art. IV, § 4, ¶ 6; N.M. Const. art. IV, § 15; N.C. Const. art II, § 22; Okla. Const. art. V, § 34; Tex. Const. art. III, § 32.  However, by the time Colorado's constitution was ratified in 1876, the "ancient practice" of reading bills aloud had become more ceremonial than practical given that the "necessity for reading is superseded by printing." Luther Stearns Cushing, *Law and Practice of Legislative Assemblies in the United States of America* 837 (1856); *see also* 1 Sutherland Statutory Construction § 10:4 (7th ed. 2020) ("When literacy was not widespread it was common practice to read bills aloud to the assembled legislature.  Some members would not have had any other means to know what they were deciding.  As literacy rates have increased amongst elected representatives, though, there has been a commensurate decline in the

historical need for reading aloud."); Bentham, *supra*, at 353 ("At the present day, [in 1791,] these three readings are purely nominal.").

¶65 Viewed in this historical context, it becomes clear that the reading requirement's function in preventing "hasty legislation" was not to slow down the legislative process, but rather to inform illiterate legislators of a bill's contents. Given the largely ceremonial nature of the reading requirement in the modern context, it is unsurprising that other states have given their respective constitutional reading requirements permissive interpretations. *See, e.g.*, *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74, 90 (Ky. 2018) (determining that "the common legislative practice of reading only the title of the bill and electronically publishing simultaneously the full text of the bill to the electronic legislative journal available on every legislator's desk satisfies the constitutional mandate"); *Gunn v. Hughes*, 210 So. 3d 969, 974 (Miss. 2017); *Weill*, 54 Cal. at 113–15.

¶66 In addition to the provision's history and purpose, there is another source that speaks to the dictates of article V, section 22: the consistent practice of the General Assembly in interpreting and implementing the reading requirement.

## V. Legislative Practice & Practical Effects

¶67 For decades, the General Assembly—under both Democratic and Republican control—has allowed for multi-voice, simultaneous reading of bills to comply with the reading requirement in article V, section 22. For example, in 2003,

11

when a Democratic senator requested that a twenty-eight-page bill be read at length during debate over a legislative redistricting plan, the Republican majority complied with the request by enlisting fifteen people to read different pages from the bill simultaneously.  *See* John J. Sanko, *Redistricting Passes — Senate GOP Votes 18-0 For*, Rocky Mountain News, May 6, 2003, at 12A, NewsBank.[5]  And in 2017, when a Republican representative requested that the entire 600-page annual budget long bill be read at length, the Democratic majority complied by having "about a dozen" staffers read different passages simultaneously, bringing the total reading time down to roughly half an hour.  *See* Vic Vela, *Meet the State Capitol's Reading Clerks, Two Guys Who Talk Really Really Fast*, CPR News (May 1, 2017), https://www.cpr.org/2017/05/01/meet-the-state-capitols-reading-clerks-two-guys-who-talk-really-really-fast [https://perma.cc/WF36-WWXL].  These readings were likely just as cacophonous as was the reading of HB 1172, but they similarly reflect the form and manner in which the legislature has chosen to comply with the reading requirement.  And it is specifically the legislature's "construction of the procedure provided by the Constitution for the passage of

---

[5] This court ultimately struck down the resulting redistricting bill on other grounds.  *See People ex rel. Salazar v. Davidson*, 79 P.3d 1221 (Colo. 2003).

bills" to which we traditionally "show great deference." *Fifty-First Gen. Assembly*, 578 P.2d at 208 (quoting *Strait*, 85 P. at 179).

¶68 What is more, requests for full-length readings are by no means infrequent; during the 2019 legislative session alone, there were at least fifteen such requests in the House and eighteen in the Senate. *See* Marianne Goodland, *A Look at the 2019 Colorado General Assembly — in Numbers*, Colorado Politics (May 8, 2019, updated July 29, 2019), https://www.coloradopolitics.com/hot-sheet/a-look-at-the-2019-colorado-general-assembly-in-numbers/article_bcc9e426-71ad-11e9-8f3e-331d07465c78.html [https://perma.cc/RGW6-5Z8R]. Under the majority's interpretation of article V, section 22, such readings may take up an increasingly substantial portion of the General Assembly's 120-day session, limiting the work that our legislature can accomplish. The framers of our constitution were likely "not intent upon burdening the legislature with such an absurd waste of time." *Bevin*, 563 S.W.3d at 90.

¶69 Finally, I am concerned about the implications of the majority's ruling today for other bills read in a similar manner to HB 1172. Though it avoids "dictating the specifics of *how* the legislature might comply with the reading requirement," maj. op. ¶ 3, today's decision calls into question other bills that were read by multiple voices or may have been unintelligible to listeners on the House or Senate floor. For example, the reading of the 2017 budget long bill was, if anything, *less*

13

intelligible than the reading of HB 1172; only one of the readers had access to a microphone and the other dozen or so readers were entirely inaudible and unintelligible. *See* Colorado Channel, *Colorado House 2017 Legislative Day 86 Part 2*, https://youtu.be/-n2btwYD6x8?t=30836. Does today's decision imply that all appropriations made by the state in 2017 were unconstitutional? The majority's conclusion certainly suggests this possibility. Today's ruling casts a pall of uncertainty over any number of legislative enactments without providing standards under which to judge their constitutionality.

## VI. Conclusion

¶70    I disagree with the majority's conclusion that the General Assembly violated article V, section 22 of the Colorado Constitution by having multiple computers simultaneously read aloud the full text of HB 1172. But I am more concerned with the precedent set today. As the majority notes, the conflict over HB 1172 is essentially moot. But by declining to articulate what article V, section 22 demands, the majority has more or less assured that more conflict over the reading requirement will occur in the future. While the majority may be able to avoid "say[ing] what the law is" today, *Marbury*, 5 U.S. at 177, this court will have to do so at some point in the future. When it does, I hope it accords appropriate weight to the plain language, history, and consistent legislative practice concerning

14

article V, section 22.  Because the majority has not done that today, I respectfully dissent.

I am authorized to state that **JUSTICE HOOD** and **JUSTICE HART** join in this dissent.

**JUSTICE HOOD**, dissenting.

¶71    I agree with Justice Márquez's dissent, but I write separately to make three additional points.  First, although this court has repeatedly paid lip service to *Baker v. Carr*, 369 U.S. 186 (1962), that case does not control political question analysis under the Colorado Constitution.  Second, to the extent that the word "read" is ambiguous, the majority fails to implement Colorado's homegrown separation-of-powers jurisprudence by showing insufficient deference to the Senate's interpretation of a constitutional provision governing the internal affairs of the legislative branch.  Third, I agree with the majority that courts cannot restrain the General Assembly from passing a bill absent extraordinary circumstances, but I would reach the issue of whether a pre-enactment injunction was justified here.  It was not.

¶72    Overall, my concern is this: The majority lauds the separation-of-powers doctrine but minimizes it in practice by authorizing courts to decide all cases involving constitutional interpretation *and* to review the General Assembly's implementation of constitutional procedures de novo.  Separation of powers demands more than the majority's rule that courts can't tell the legislative branch what *to* do but can tell it what *not* to do.

## I. *Baker v. Carr*

¶73 The majority begins its justiciability analysis by noting that the "the meaningful utility of [the six *Baker*] characteristics has been questioned by well-respected legal scholars." Maj. op. ¶ 24. The majority also recognizes that, "[h]elpful or not, the *Baker* characteristics cannot be mechanically applied here because Colorado district courts, unlike their federal counterparts, are courts of general jurisdiction." *Id.* at ¶ 25. The majority even quotes Justice Brennan's admonition that "state courts that rest their decisions . . . on state law need not apply federal principles of . . . justiciability." *Id.* (quoting William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501 (1977)).

¶74 Despite this, the majority seems to hold its nose because "we have consistently considered the characteristics outlined in *Baker* in our previous forays into the realm of justiciability." *Id.* at ¶ 26. Yet the majority doesn't examine how the six *Baker* factors would apply here. *See id.* at ¶¶ 26–30. Instead, it simply reasons by analogy, holding that there's no *Baker* problem in this case because there wasn't one in *Colorado Common Cause v. Bledsoe*, 810 P.2d 201, 205–06 (Colo. 1991). Maj. op. ¶¶ 26–30. The majority's justiciability analysis ends by labeling the parties' dispute as a matter of "constitutional interpretation," *id.* at ¶ 30, which

is something "peculiarly [within] the province of the judiciary," *id.* (quoting *Bledsoe*, 810 P.2d at 206).

¶75 Sure, the majority reaches the right result on justiciability: Questions of constitutional interpretation—even those affecting the procedures of another branch—are justiciable under Colorado law. But *Baker* isn't why. On the contrary, *Baker* factors exist to tell federal courts when constitutional interpretation "is entrusted to one of the political branches," so the majority can't be right to say that an issue is justiciable *because* it involves constitutional interpretation. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004)). The threshold question that the *Baker* factors seek to answer is *who* should make the call. Yet that's not how we've used it, at least not in earnest.

¶76 More typically, we invoke *Baker*, breeze past it, and then come home to our rule that Colorado courts are free to decide even seemingly political questions under the Colorado Constitution. *Bledsoe* is a perfect example. In *Bledsoe*, this court recited the *Baker* factors, summarily concluded that "we do not find present any of the [*Baker*] political-question characteristics," 810 P.2d at 206, and landed on the principle that "it is peculiarly the province of the judiciary to interpret the constitution," *id.* (quoting *Colo. Gen. Assembly v. Lamm*, 704 P.2d 1371, 1378 (Colo. 1985)). *See also Busse v. City of Golden*, 73 P.3d 660, 664 (Colo. 2003) (devoting two sentences to paraphrasing the first three *Baker* factors and to finding that they

3

weren't present); *Meyer v. Lamm*, 846 P.2d 862, 873 (Colo. 1993) (listing the *Baker* factors, mentioning that the first factor was absent, and concluding that "none of the other *Baker v. Carr* factors of nonjusticiability are implicated").

¶77 And today the majority repeats the mistake, just when it seemed that we had kicked the habit. In *Lobato v. State*, 218 P.3d 358, 363 (Colo. 2009), our most recent political question case, we noted that "[w]e have never applied the political question doctrine to avoid deciding a constitutional question."[1] We described *Baker* as having articulated "the *federal* political question criteria" and held that

---

[1] This court has found the following issues justiciable: whether Colorado's school finance system was constitutionally adequate, *Lobato*, 218 P.3d at 374; whether state legislators had violated a constitutional prohibition against committing themselves to voting for or against legislation at caucus meetings, *Bledsoe*, 810 P.2d at 211; whether the governor's item veto was unconstitutional because he had allegedly vetoed only part of an item, *Lamm*, 704 P.2d at 1378; whether the Senate had properly taken the "ayes and noes" when it passed a bill, *In re Interrogatories of Governor Regarding Certain Bills of Fifty-First Gen. Assembly*, 578 P.2d 200, 207 (Colo. 1978); whether a law was void due to the General Assembly's alleged violation of the state constitution's publication requirement for session laws, *In re Interrogatories from House of Representatives Concerning Senate Bill No. 24, Thirty-Ninth Gen. Assembly*, 254 P.2d 853, 856–57 (Colo. 1953); whether a law was invalid because the Senate had unconstitutionally failed to record the vote in its journal, *People ex rel. Manville v. Leddy*, 123 P. 824, 830 (Colo. 1912); whether the House had failed to properly record a vote in its journal, *Bd. of Cnty. Comm'rs v. Strait*, 85 P. 178, 180–81 (Colo. 1906); whether an amendment was "substantial" and thus needed to be printed, *In re House Bill No. 250*, 57 P. 49, 50 (Colo. 1899); and whether the House had the power to remove its speaker, *In re Speakership of the House of Representatives*, 25 P. 707, 710 (Colo. 1891).

"the *Baker* test does not apply" to claims under the Colorado Constitution's guarantee of a "thorough and uniform" public school system. *Id.* at 367–68 (emphasis added). The *Lobato* dissent accurately recognized the case as "either an abandonment of the political question doctrine writ large or a more limited refusal to apply *Baker* to decide political questions." *Id.* at 377 n.2 (Rice, J., dissenting).

¶78 Admittedly, *Lobato* involved the unusual circumstance of an affirmative right, but our critique of *Baker* didn't turn on that fact. *See id.* at 369–71. In addition to the criticisms repeated by the majority opinion, we said that the Court's way of identifying unmanageable standards was itself unmanageable and we highlighted our power to render advisory opinions on questions submitted by the legislature or executive. *Id.* at 369–70.

¶79 Today, the majority misses an opportunity to clean up the law by admitting that, despite our professed (but at best inconsistent) fealty to *Baker*, it does not dictate the justiciability of political questions under Colorado law.

## II. Insufficient Deference

¶80 Regardless of the vitality of *Baker* in Colorado, our case law requires courts to decide justiciable issues with "great deference to the legislative construction of the Constitution, particularly with reference to its construction of the procedure provided by the Constitution for the passage of bills." *In re Interrogatories of*

*Governor Regarding Certain Bills of Fifty-First Gen. Assembly*, 578 P.2d 200, 207 (Colo. 1978) (quoting *Bd. of Cnty. Comm'rs v. Strait*, 85 P. 178, 179 (Colo. 1906)).

¶81 That deference has led us to ratify the General Assembly's implementation of constitutional procedures even when we had "serious doubts as to the correctness of the legislative practice" and were "not prepared to say that unaided by the legislative construction . . . our construction would have been the same." *Id.* at 208 (quoting *Strait*, 85 P. at 180); *see also In re Great Outdoors Colo. Tr. Fund*, 913 P.2d 533, 538 (Colo. 1996) ("Where possible, courts should adopt a construction of a constitutional provision in keeping with that given by coordinate branches of government."); *In re Legis. Reapportionment*, 374 P.2d 66, 69 (Colo. 1962) ("There is . . . a presumption . . . that the Legislature has acted according to its oath to uphold the constitution unless the contrary appears beyond doubt."); *Strait*, 85 P. at 180 ("When there is a real doubt of the proper interpretation of a constitutional provision relating to the course of procedure, it should be solved in favor of the practical construction given it by the Legislature." (quoting *Browning v. Powers*, 38 S.W. 943, 945 (Mo. 1897))); *In re Speakership of the House of Representatives*, 25 P. 707, 710 (Colo. 1891) (recognizing that the General Assembly's power to govern its own proceedings, "when exercised within legitimate limits, is conclusive upon every department of the government").

¶82    *Fifty-First General Assembly* is instructive.  In that case, we reviewed whether the General Assembly had complied with a constitutional requirement that a "vote be taken by ayes and noes" when passing legislation.  *Fifty-First Gen. Assembly*, 578 P.2d at 205 (quoting Colo. Const. art. V, § 22).  The General Assembly had adopted the eyebrow-raising practice of voting by referring to earlier attendance roll calls such that "present" became "aye" and "absent" became "no."  *Id.*  Since the ayes and noes requirement did "not specify in exactly what manner the ayes and noes are to be taken," we looked at whether the General Assembly's practice could be squared with the provision's text and purpose.  *Id.* at 207–08; *see Great Outdoors Colo. Tr. Fund*, 913 P.2d at 539 ("[T]he General Assembly is authorized to resolve ambiguities . . . in a manner consistent with the terms and underlying purposes of . . . constitutional provisions.").  The text was satisfied because the ayes and noes were literally "recorded in the official journal," and the purpose was met because members "were afforded the opportunity to approve or disapprove the pending bill" by objecting to the use of the previous roll call.  *Fifty-First Gen. Assembly*, 578 P.2d at 208.  That arguable compliance prompted us to resolve our "serious doubts" in favor of the General Assembly.  *Id.* (quoting *Strait*, 85 P. at 180).

¶83    In *Fifty-First General Assembly*, we could have raked the General Assembly over the coals by examining unfavorable definitions of "vote"; instead, we showed "great deference."  *Id.* (quoting *Strait*, 85 P. at 179).  In contrast, the majority seems

7

to review the Senate's interpretation of the reading requirement with little to no deference, measuring what the Senate did against different definitions of "read" and concluding that the Senate violated the word's "ordinary and popular meaning." Maj. op. ¶¶ 33, 36.

¶84 Indeed, the majority effectively doubles down when it states that "issues of constitutional interpretation . . . are subject to de novo review." *Id.* at ¶ 20. While this is true in the ordinary course, we have a "duty" to resolve even "serious doubts" in favor of the Senate's interpretation because the reading requirement is a "procedure provided by the Constitution for the passage of bills." *Fifty-First Gen. Assembly*, 578 P.2d at 208 (quoting *Strait*, 85 P. at 179–80). This crucial principle is nowhere to be found in the majority's discussion of the standard of review.

¶85 The majority holds that the Senate did not read House Bill 1172 ("HB 1172") in part because some dictionaries specify that "reading" requires words to be "pronounced in their proper order" but the Senate's computers read different sections of the bill simultaneously. Maj. op. ¶ 36. Further, the majority finds that the Senate didn't read HB 1172 because the computers created a cacophony that divorced the bill's words from "the sounds that customarily accompany" them. *Id.*

¶86 I agree with Justice Márquez that other dictionaries reveal that "read" unambiguously means "nothing more than the ordinary act of uttering words

8

aloud," which the Senate did when it caused computers to speak the entire text of HB 1172. Márquez, J., diss. op. ¶¶ 59, 61. However, to the extent that the reading requirement is ambiguous because it "does not specify in exactly what manner" a bill must be read, I would still hold that the Senate sufficiently complied with the provision's text. *Fifty-First Gen. Assembly*, 578 P.2d at 207; *see also Grossman v. Dean*, 80 P.3d 952, 963 (Colo. App. 2003) (interpreting the "intentionally general" constitutional requirement that committees "consider[]" certain bills as requiring "some level of discussion, debate, or testimony" but not "any specific form of committee consideration in every situation"). Even if this court is "not without serious doubts as to the correctness of the [Senate's] practice," separation-of-powers concerns require us "to resolve the doubt in favor of the" Senate. *Fifty-First Gen. Assembly*, 578 P.2d at 208 (quoting *Strait*, 85 P. at 180).

¶87 And this deferential approach is hardly some quirk of Colorado law. Just a few years ago, the Kentucky Supreme Court addressed a challenge under Kentucky's reading requirement by asking whether a reading had happened that "even plausibly comport[s] with any conception of the phrase 'read at length' . . . [u]nder any plausible meaning of those words that remains faithful to the English language." *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74, 85 (Ky. 2018). In *Bevin*, the court okayed the practice of reading a bill "at length" by reciting only the title but held that the Kentucky General Assembly had failed to do even that

9

because it had read an inaccurate title. *Id.* at 90. Yet the Kentucky Supreme Court distinguished the facts before it from those of *Gunn v. Hughes*, 210 So. 3d 969, 971 (Miss. 2017), in which a computer read a bill on its highest speed. *Bevin*, 563 S.W.3d at 85. "However preposterous it was [in *Gunn*] to physically read aloud a bill at an incomprehensible pace, it cannot be disputed that the bill was literally read aloud in its entirety." *Id.* ("The [Mississippi Supreme] Court declined to engage in the minutia of directing the legislature how fast or slow it must read the bill.").[2]

¶88 The majority also concludes that the speedreading of HB 1172 "can in no way be reasonably viewed as consistent with" the reading requirement's purpose. Maj. op. ¶ 40. According to the majority, that purpose is "[t]o afford protection from hasty legislation." *Id.* (quoting *Proceedings of the Constitutional Convention of 1875* 725 (1907)). Putting to one side Justice Márquez's point that the purpose of the reading requirement was to inform illiterate legislators, *see* Márquez, J., diss. op. ¶¶ 62–65, the majority's argument fails on its own terms.

---

[2] In *Gunn*, the Mississippi Supreme Court declined to stop the electronic speedreading of bills, although it reached that result by holding that challenges under Mississippi's reading clause are nonjusticiable given the Mississippi Constitution's separation-of-powers doctrine, rather than through deference to the legislature's interpretation. 210 So. 3d at 974.

¶89 HB 1172 was read from approximately 10:30 a.m. to 5:20 p.m. If the purpose of the reading requirement is delay, then that purpose was served here: The Senate devoted seven hours of its 120-day session to a bill that recodified a statutory title. Further, if the majority thinks that seven hours was unconstitutionally brief, the provision's separate rule that the bill be read "on two different days" ensures that determined senators can always double the delay and that the Senate can't speedread a bill and pass it that same day. Colo. Const. art. V, § 22. And, again, if the majority thinks that the Senate plausibly fulfilled the purpose of the reading requirement, it must show great deference and resolve even serious doubts in favor of the Senate.

¶90 Because the Senate arguably complied with the text and purpose of the reading requirement, I would reverse the district court. But even if I thought that the majority was right to affirm, I would still dissent from the majority's discussion of injunctive relief in Part II.D of its opinion.

### III. Pre-Enactment Injunctive Relief

¶91 The majority rightly reaffirms that "issuing injunctive relief prior to the enactment of a bill interferes with the legislative process and is unwarranted absent 'extraordinary circumstances.'" Maj. op. ¶ 19 n.6 (quoting *Lewis v. Denver City Waterworks Co.*, 34 P. 993, 995 (Colo. 1893)). The majority chooses not to reach the issue of whether such extraordinary circumstances existed here because it

11

views the matter as beyond the questions presented. *Id.* Even so, the majority's footnote matters. Without that disclaimer, the court's opinion affirming the judgment of the district court could be misconstrued as condoning pre-enactment injunctive relief. Now, that shouldn't happen.

¶92 Still, I would reach this issue because the presence (or absence) of extraordinary circumstances goes to the second question presented: "[w]hether the [d]istrict [c]ourt correctly evaluated the requirements for injunctive relief to direct the manner of the State Senate's 'reading' of a pending bill." When a bill is "pending," the requirements for injunctive relief exceed the criteria from C.R.C.P. 65 and *Rathke v. MacFarlane*, 648 P.2d 648 (Colo. 1982).

¶93 In almost all cases, "the legislature cannot be . . . restrained from passing an act, even though the constitution expressly forbids it." *Bledsoe*, 810 P.2d at 208 (quoting *Lewis*, 34 P. at 994); *see Polhill v. Buckley*, 923 P.2d 119, 121 (Colo. 1996) ("Our case law embodies a strong tradition which holds that courts cannot interfere with the ongoing legislative process except in extraordinary circumstances."). "In the enactment of [legislation] by the general assembly, . . . each step must be taken as the constitution provides, yet while the measure is . . . in process of legislation, the general assembly is the judge of whether the steps are being so taken . . . ." *Polhill*, 923 P.2d at 122 (quoting *Speer v. People*, 122 P. 768, 770 (Colo. 1912)).

¶94 In *Bledsoe*, we held that a district court hadn't abused its discretion when it dismissed a pre-enactment request to enjoin legislators from violating a constitutional procedure. 810 P.2d at 204. We reasoned, "[T]he judiciary's role in large part is limited to measuring legislative *enactments* against the standard of the constitution, and declaring them null and void if they are violative of the constitution." *Id.* at 210 (emphasis added). In contrast, a court can issue pre-enactment declaratory relief against the General Assembly because that doesn't "present the same kind or degree of affirmative interference with legislative activities." *Id.* at 211; *accord Grossman*, 80 P.3d at 961 ("A request that the court enjoin conduct by the legislature generally entails an improper intrusion into legislative affairs, but a request for a declaratory judgment that an action is unconstitutional may be addressed by the court.").

¶95 So, the majority is correct that pre-enactment injunctive relief was inappropriate here unless there were "extraordinary circumstances" warranting that intrusion into the legislative sphere. Maj. op. ¶ 19 n.6 (quoting *Lewis*, 34 P. at 995). Two of the respondents were prime sponsors of HB 1172, and they argue that post-enactment relief would not have vindicated their dual interests in the constitutional viability of their legislation and the enforcement of the reading requirement. *See Polhill*, 923 P.2d at 122 ("In an appropriate case, this court may exercise its equitable powers where no adequate remedy is provided by the [post-

13

enactment review] process."). At oral argument, however, respondents volunteered that their goal was to "stall the majority's consideration of other bills." Such political tactics cannot transmute this matter into one of the "extreme cases" that justify a suspension of our usual prohibition against pre-enactment injunctions. *Lewis*, 34 P. at 995.

¶96 Given the lack of extraordinary circumstances, the problem with the district court's injunctive relief is that it happened at all, not that it dictated how to comply with the reading requirement.

## IV. Conclusion

¶97 I respectfully dissent because *Baker* is not the law in Colorado and the district court showed insufficient deference to the Senate. By reviewing the Senate's interpretation of the reading requirement de novo, the majority saps the separation-of-powers doctrine of any practical force in this sensitive case.

I am authorized to state that **JUSTICE MÁRQUEZ** and **JUSTICE HART** join in this dissent.