23CA1240 Silver v S&D Law 01-23-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1240
City and County of Denver District Court No. 17CV34514
Honorable Jill D. Dorancy, Judge

Joe L. Silver,

Plaintiff-Appellant and Cross-Appellee

v.

S&D Law, Steve Kelly, and Gary Blum,

Defendants-Appellees and Cross-Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE GOMEZ
Fox and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 23, 2025

Haddon, Morgan and Foreman, P.C., Ty Gee, Adam Mueller, Denver, Colorado,
for Plaintiff-Appellant and Cross-Appellee

Davis Graham & Stubbs LLP, Theresa Wardon Benz, Claire Mueller, Denver,
Colorado, for Defendants-Appellees and Cross-Appellants

¶ 1      Plaintiff, Joe L. Silver, a former shareholder of S&D Law, appeals the district court's entry of a declaratory judgment in favor of defendants, S&D Law, Steve Kelly, and Gary Blum, on issues relating to a 2001 S&D Law Shareholders' Agreement. Defendants cross-appeal the district court's order denying their requests for costs. We conclude that, following a remand from another division of this court, the district court erred in assessing the severability of the 2001 Agreement. Accordingly, we reverse the judgment, remand the case with directions, and decline to consider the issues of costs as they are premature at this time.

## I.     Background

### A.     The Underlying Dispute

¶ 2      In 1985, Silver and Bruce DeBoskey formed a law firm that became S&D Law. Until 2001, Silver and DeBoskey were the only and equal shareholders of the firm.

¶ 3      This case arises from a dispute concerning the 2001 Agreement, which governed DeBoskey's imminent retirement and departure from the firm, Silver's eventual departure from the firm, and the entry of new shareholders — specifically Kelly and Blum — into the firm. Silver (acting for himself and S&D Law) and

DeBoskey negotiated and signed the agreement, and all of S&D Law's shareholders and directors at the time approved it.

¶ 4     The "DeBoskey Share Redemption" provision in the 2001 Agreement addressed the payout to DeBoskey upon his departure from the firm. This provision entitled DeBoskey to $200,000, representing the return of his ante plus interest. It also provided that DeBoskey would be entitled to additional amounts from four still-pending contingency cases, including 33% of the fees from a case referred to as the *Cook* case. By 2006, S&D Law had paid DeBoskey everything he was owed under this provision, except for any potential *Cook* fees.

¶ 5     The "Silver Transition Amount" provision, in turn, addressed the payout to Silver upon his eventual departure from the firm. The first sentence of this provision, which the parties refer to as the "Silver Clause," provides,

> To attain fairness for the transition resulting from [S&D Law's] redemption of DeBoskey's shares and [S&D Law's] conversion to an ante system for the admission of new shareholders as herein provided, [S&D Law] shall attempt to equalize for Silver the benefits received by DeBoskey.

¶ 6      When Silver retired in 2013, S&D Law agreed to pay him a $115,000 "transition amount" plus additional payments for redemption of his stock and for interest.

¶ 7      In 2017, S&D Law received about $14.6 million in attorney fees from the *Cook* case. DeBoskey requested payment of 33% of those fees pursuant to the DeBoskey Share Redemption provision in the 2001 Agreement. Although S&D Law initially refused that request, the parties eventually reached a settlement whereby the firm paid DeBoskey $4,541,652 in *Cook* fees.

¶ 8      Silver then insisted that the "Silver Clause" in the 2001 Agreement entitled him to that same amount. When S&D Law refused to pay Silver, he filed this action asserting claims for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) declaratory judgment; and (4) unjust enrichment. S&D Law brought counterclaims for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) declaratory judgment; and (4) breach of fiduciary duty.

¶ 9      All claims, other than Silver's claim for unjust enrichment (which was dismissed before trial) and both sides' claims for declaratory judgment (which were reserved for the court), were

submitted to a jury. Following a trial, the jury found for Silver on his claim for breach of contract and awarded him $4,541,652 (the same amount DeBoskey had received in *Cook* fees) in damages. The jury also found for Silver on his claim for breach of the covenant of good faith and fair dealing and awarded him $1 in nominal damages. The jury found against S&D Law on its contract and good faith and fair dealing counterclaims but found in its favor on its counterclaim for breach of fiduciary duty, awarding it about $1.5 million in damages (of which 80% fault was attributed to Silver and the other 20% to Kelly, Blum, and another individual). Although S&D Law pursued six different theories on its breach of fiduciary duty claim, the general verdict form (given at Silver's insistence) didn't specify which breach or breaches the jury found.[1]

---

[1] Those six theories were that Silver (1) created an agreement that allowed him and DeBoskey collectively to claim nearly two-thirds of the *Cook* fees; (2) created an agreement that allowed him to collect over $4.5 million in *Cook* fees although he only worked 16.5 hours on the case; (3) created an agreement that risked S&D Law having to pay taxes on any payout of *Cook* fees to DeBoskey and himself; (4) repeatedly failed to disclose his interpretation of the 2001 Agreement to other firm directors; (5) engaged in a self-interested transaction; and (6) exposed S&D Law to DeBoskey's claims and overpayments.

¶ 10    After trial, S&D Law filed a motion for a declaratory judgment, asking the court to sever and void the 2001 Agreement's Silver Clause due to Silver's breach of fiduciary duty, in lieu of entering judgment on the damage awards.  The district court denied the motion on the basis that S&D Law had already elected — and was bound to — its chosen remedy.  The court then entered judgment on the damage awards.

## B.    First Appeal and Remand

¶ 11    As relevant here, in the first appeal, a division of this court reversed the district court's post-verdict order denying S&D Law's motion for a declaratory judgment.  *See Silver v. S&D Law*, slip op. at ¶ 103 (Colo. App. Nos. 19CA1784 & 19CA2177, Dec. 9, 2021) (not published pursuant to C.A.R. 35(e)).  The division concluded that the district court had erred by denying the motion on the basis of election of remedies and remanded the case for consideration of the motion on the merits.  *Id.* at ¶¶ 86, 92.  The division explained that the district court needed to consider the merits of the motion in the first instance, given that the decision whether to grant declaratory relief lay within its sound discretion and that there were several unresolved issues underlying the requested relief.  *Id.* at

5

¶ 88.  Among those issues were whether S&D Law could void just the Silver Clause or would have to void the entire 2001 Agreement, and whether voiding part or all of the agreement would be impractical or inequitable.  *Id.* at ¶ 90.

¶ 12    On remand, a different judge on the district court granted the motion for a declaratory judgment, severing and voiding the Silver Clause.  Regarding the issue of whether S&D Law could void just the Silver Clause (at least as it pertains to the *Cook* fees), the court's entire reasoning, after reciting the applicable law, was as follows:

> The Court finds that the 2001 Agreement contained multiple promises and agreements incorporated into one contract.  Had the *Cook* fees not been awarded, the remainder of the contract would have already been fulfilled and there would be no dispute about whether the entire contract should be void.  Thus, the Silver Clause was not contingent on any other provision in the 2001 Agreement.
>
> Considering that the remainder of the terms of the contract have already been fulfilled, the Court finds that the agreement is severable and that the Court has the authority to void only the Silver Clause rather than the entire contract.

The court then concluded that the Silver Clause is voidable, that voiding the clause is not impractical or inequitable, and that a declaratory judgment to that effect is appropriate. The court entered judgment accordingly.

¶ 13 Silver appeals that judgment. Defendants cross-appeal, challenging the denial of their requests for an award of costs.

## II. Declaratory Judgment

¶ 14 We first consider Silver's challenge to the district court's entry of a declaratory judgment. Silver challenges the court's determinations that (1) the Silver Clause is severable; (2) voiding the clause is not impractical or inequitable; and (3) a declaratory judgment severing and voiding the clause is appropriate. Because we agree that the district court erred in resolving the issue of severability, we don't reach the other two issues.

## A. Standard of Review

¶ 15 We review a district court's entry of a declaratory judgment for an abuse of discretion. *Nash v. Mikesell*, 2024 COA 68, ¶ 15. A court abuses its discretion when its decision is manifestly arbitrary, unfair, or unreasonable or when it misapplies the law. *In re Marriage of Herold*, 2021 COA 16, ¶ 5.

¶ 16    However, we review a court's interpretation and application of the law de novo. *Id.* Likewise, when the basis for a declaratory judgment is a matter of contract interpretation, we review the court's determination de novo. *See Markwell v. Cooke*, 2021 CO 17, ¶ 22; *CapitalValue Advisors, LLC v. K2D, Inc.*, 2013 COA 125, ¶ 17.

## B.    Severability

¶ 17    As a preliminary matter, we assume that in order to void the Silver Clause based on Silver's breach of fiduciary duty, the 2001 Agreement must be severable. Silver cites case law indicating that a contract must be severable for a provision in the contract to be voided. *See, e.g.*, *Univex Int'l, Inc. v. Orix Credit All., Inc.*, 914 P.2d 1355, 1357 (Colo. 1996) ("[A] contract cannot be severed unless the language of the contract manifests each party's intent to treat the contract as divisible."); *Woodward v. Jacobs*, 541 P.2d 691, 692 (Colo. App. 1975) (not published pursuant to C.A.R. 35(f)) ("Where an illegal condition or promise on one side is a part of the consideration for the entire obligation on the other side, it is owing to the impossibility of determining the weight or extent of such portion of the consideration which moved to induce the engagement thereupon, that such void promise for consideration is held to be

8

unseverable, and avoids the whole contract." (quoting *Giles v. DeCow*, 70 P. 681, 681 (Colo. 1902))). *See generally CapitalValue*, ¶¶ 22-24. S&D Law neither develops any contrary argument nor cites any directly contrary authority.

¶ 18 "In determining whether a contract is severable, '[t]he primary objective is to ascertain the intent of the contracting parties . . . .'" *CapitalValue*, ¶ 24 (quoting *John v. United Advert., Inc.*, 439 P.2d 53, 56 (Colo. 1968)). Thus, when considering whether the promises in a contract are severable from one another, the court should inquire "whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." *Id.* (quoting *John*, 439 P.2d at 56); *see also L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1349 (Colo. App. 1986) ("For a contract to be divisible, it must be apparent that the parties have assented separately to successive divisions thereof upon performance of which the other party will be bound.").

¶ 19 The parties' intent may be manifested by the terms of the contract itself, as well as by the circumstances surrounding the contract's formation. *John*, 439 P.2d at 56; *CapitalValue*, ¶ 24. For

9

instance, a severability clause would likely indicate that the parties intended a contract to be severable, though the absence of such a clause "does not conclusively establish that the parties did not intend that [an] [a]greement be severable." *CapitalValue*, ¶ 29. In addition, "the singleness or apportionability of the consideration" may be relevant to determining severability. *John*, 439 P.2d at 56; *see also Woodward*, 541 P.2d at 692. And the parties' conduct before the dispute arose may also point to their intent regarding severability. *John*, 439 P.2d at 56; *CapitalValue*, ¶ 29.

¶ 20 Here, in determining that the 2001 Agreement is severable, the district court didn't make any findings about the contracting parties' intent. Rather, the court found only that the agreement contains "multiple promises and agreements incorporated into one contract" and that all of those promises and agreements, other than the payment of *Cook* fees under the Silver Clause, had already been fulfilled by the time the dispute arose.

¶ 21 But the fact that a contract "contains multiple promises, each of which may constitute a separate agreement or contract," doesn't negate the requirement that the parties intended for those promises to be severable. *CapitalValue*, ¶ 35. Concluding that a contract

includes more than one promise is only the first step; the court then must consider, based on the language of the contract and any evidence surrounding its formation and application, whether the parties intended for those promises to be severable. *See id.* at ¶ 22; *see also Homier v. Faricy Truck & Equip. Co.*, 784 P.2d 798, 801 (Colo. App. 1988) ("[I]t is not the number of items in the contract which is determinative of whether it is severable, but the nature of the object or objects in the contract.").

¶ 22     The district court didn't undertake that analysis here and didn't make any findings concerning the contracting parties' intent as to severability. This was error. *See CapitalValue*, ¶¶ 25, 30 (reversing a district court's determination on severability where the court "did not ascertain the intent of the parties in concluding that the contract was not severable").

¶ 23     Although both sides cite evidence from the trial that they contend shows the parties either did or did not intend for the 2001 Agreement to be severable, it is solely within the district court's province — not ours — to make findings based on that evidence. *See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO

51, ¶ 19 ("[A]ppellate tribunals don't (and, indeed, can't) make findings of fact.").

¶ 24    We therefore reverse the judgment and remand the case for the district court to make findings regarding the parties' intent as to the severability of the 2001 Agreement.  In its discretion, the court may determine whether to make findings on the existing record or allow the parties to submit additional evidence.

## III.    Cost Award

¶ 25    Because we are reversing the judgment and remanding for additional findings, any rulings concerning the availability of costs as a prevailing party are premature.  Accordingly, we don't address the cost issues raised in defendants' cross-appeal.

## IV.    Disposition

¶ 26    The judgment is reversed, and the case is remanded for the district court to make findings as to whether the parties to the 2001 Agreement intended for that agreement to be severable.

JUDGE FOX and JUDGE LUM concur.